THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD HOWARD, Defendant-Appellant.

First District (1st Division) No. 1—88—2284

Opinion filed January 14, 1991.—Rehearing denied March 21, 1991.

160

164

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Sonnenschein, Carlin, Nath & Rosenthal, both of Chicago (John I. Grossbart, Philip A. O'Connell, Jr., Deborah L. Toizer, and Leslie J. Khoshaba, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, David R. Butzen, and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of this court:

Following a jury trial, defendant, Edward Howard, was found guilty of the murder of Allen Nuccio and sentenced to a prison term of 36 years. On appeal, defendant contends that: (1) the State failed to prove him guilty of murder beyond a reasonable doubt; (2) the trial

court committed reversible error when it: (a) admitted a gun into evidence that was not connected to the murder; (b) refused to give an accomplice instruction regarding the testimony of two witnesses; (c) admitted hearsay statements into evidence under the coconspirator exception to the hearsay rule when no *prima facie* case of conspiracy had been established; and (3) the State's comments during closing argument were so prejudicial as to deny defendant his right to a fair trial. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. On Saturday morning, November 29, 1986, the police discovered Allen Nuccio's body in the back of his tow truck, which was parked in a vacant lot on south Emerald Avenue in Chicago. Nuccio had been shot numerous times in the head, neck and chest. At the time of his murder, Nuccio had been separated from his wife and lived with defendant in a third-floor apartment located above the Fifth Wheel, a tavern at 4439 S. Halsted, Chicago, two blocks from where his body was found. No guns, bullets or fingerprints were found in the truck, and there was very little blood around the body. The Fifth Wheel and the apartments above it were owned by Don Barnett.

Christine Robbins, a frequent patron of the Fifth Wheel, testified on behalf of the State that on the early afternoon of Thursday, November 27, 1986, Thanksgiving day, she stopped at the Fifth Wheel to purchase some potato chips and pop for her kids, who were at the park across the street, and saw defendant, Barnett and Nuccio standing at the bar. Barnett was preparing a Thanksgiving dinner for the Fifth Wheel patrons and asked defendant and Nuccio to purchase some more bread for the dinner. Defendant and Nuccio left to buy the bread and Chris went back to the park. A short time later, when Chris returned to the tavern to purchase some more pop, she followed defendant into the tavern, saw him walk up to Barnett, and overheard him say to Barnett that he thought Nuccio was a cop. At that point, Chris left, picked up her kids from the park and went home.

Later that evening, Chris returned to the Fifth Wheel for the Thanksgiving dinner. When the tavern closed at 4 a.m., Chris, defendant, Nuccio, Tim Taylor, Barnett and several others exited through the tavern's rear door and went up to defendant's third-floor apartment. Nuccio gave Tim Taylor some money and told him to get some cocaine. When Tim returned with the cocaine, Nuccio poured out some lines of cocaine and everybody snorted one. Nuccio then grabbed the bag of cocaine and handed it to defendant, telling him to put it away in case the police came. Defendant walked over to the

drain pipe and acted like he was putting the bag in the drain pipe. In fact, Chris saw him put it in his pocket.

A few minutes later, Nuccio told defendant to get the cocaine out of the drain pipe so that he could pour a few more lines. Defendant turned on the water and told Nuccio that he had accidentally flushed the cocaine down the drain. Later that night, Chris overheard Barnett tell Terry Taylor, Tim's brother, that he thought Nuccio was a cop. When Chris left defendant's apartment, she went downstairs to spend the night in a vacant apartment on the second floor.

The next morning, November 28, 1986, Chris woke up approximately 10 a.m. and on her way out of the apartment building, she heard defendant and Nuccio arguing on the third floor. Nuccio asked defendant if he was selling cocaine and defendant said that he was not. Chris left and did not hear any further conversation.

The following morning, November 29, 1986, approximately 2 a.m., Chris went to the Fifth Wheel to have a drink. While she was playing a video game near Barnett's office, she saw Barnett, defendant and Tim Taylor walk into Barnett's office. At that point, the rear door of the tavern opened and Nuccio walked in, bought a six-pack of beer, and left through the rear door. A few minutes later, Barnett, defendant and Tim Taylor came out of the office and Tim left the tavern through the rear door. When Barnett and defendant were walking toward the bar, Chris overheard Barnett tell defendant that he believed Nuccio was a cop. Tim came back into the tavern, and he, Barnett and defendant went back into Barnett's office. A couple of minutes later, as the three men exited the office, Chris saw Barnett hand defendant a silver .22 caliber handgun with a pearl handle. Several months earlier, Chris had seen Barnett with the same gun. Defendant left the tavern through the rear door, and Tim and Barnett went back to the bar. "Last call" was announced and Tim locked the rear door.

After Chris left the tavern, she rode around with some friends for a while, drinking and snorting cocaine. She then asked them to drop her off at the Fifth Wheel apartments. While she was climbing the rear stairs, she heard a loud bang which she thought was an M80 firecracker. When she got to the second floor, Tim Taylor and a female came running down the stairs, arguing. She then went up to her apartment and went to bed.

Several days later, Chris heard that Nuccio had been killed. On December 3, 1986, Chris saw defendant at the Fifth Wheel and heard him say, "I did it. We all did it. I killed TJ [Nuccio]." Barnett then walked over to him, grabbed him by the neck and told him to shut up

before he got them all into trouble. At that point, Chris left the tavern.

In December 1986, Chris moved to Streator, Illinois, where she lived for seven months before returning to Chicago. She did not tell the police about the events of November 28-29, 1986, until the end of April 1988 because she was scared of Barnett and defendant.

Sean Dwyer then testified on behalf of the State as to the events surrounding the shooting. At the time Nuccio was murdered, Dwyer had known defendant, Barnett and Tim Taylor for approximately three years. Dwyer did not meet Nuccio until November 1986. Approximately 10 days before Nuccio was killed, Barnett told Dwyer that he, defendant and Tim Taylor thought Nuccio was a cop. About a week after that comment, Tim told Dwyer not to trust Nuccio because he had popped up out of nowhere with $10,000.

Late Friday evening, November 28, 1986, Dwyer went to defendant's apartment with Barnett, defendant and Tim. Nuccio was already there, drinking and doing cocaine. Tim kept leaving and returning to the apartment. At one point, Barnett asked Dwyer to go outside and look for another guy. Dwyer left and returned approximately 10 minutes later. While walking up the stairs to defendant's apartment, Dwyer saw Gidget Robbins entering the apartment and followed her inside. While Dwyer and Gidget were standing in the kitchen, Tim entered the apartment through the front door and started shooting at Nuccio, who was approximately six to eight feet away. Dwyer did not actually see the gun, but he saw Tim's arms extended forward, heard the shots and saw Nuccio slump over. At the time of the shooting, defendant and Barnett were sitting alongside the door. When the shooting started, Dwyer and Gidget dove into a corner and ducked. He heard approximately six to eight shots. When the shooting stopped, Dwyer looked at Nuccio. He was slumped down in his chair, blood was on his beard and his clothes, as well as on the floor and on the chair. However, Nuccio was not dead. Dwyer could hear him making gagging and choking sounds. At that point, Dwyer and Gidget started yelling, "What's going on?" Defendant told them to calm down and Tim left.

When Dwyer told Barnett he wanted to leave, Barnett told him to wait. After a few minutes, Barnett gave Dwyer some cocaine and told him that he could leave, but not to come back for a while. As he was leaving, Dwyer heard Barnett say to Nuccio, who was choking, "Shut up, you fucking cop." When Dwyer left, it was approximately 4 a.m. Dwyer did not talk to the police about the incident until May 1988 because he was scared of Barnett and defendant.

Alice "Gidget" Robbins, Christine Robbins' sister, testified that in the early morning hours of November 29, 1986, she met up with Sean Dwyer and the two of them went to defendant's apartment. Defendant, Barnett and Nuccio were there. Just as Dwyer was handing her a marijuana joint, Gidget heard a loud "boom" and Tim Taylor kicked in the front door and started shooting Nuccio with a small silver gun. He fired at least three shots. Gidget and Dwyer fell to the floor. When the shooting stopped and Gidget and Dwyer tried to leave, defendant blocked the door and said, "You're not going anywhere. You didn't see what you just saw." Barnett then motioned defendant away and told Gidget and Dwyer that if they said anything, he would kill them and their families. Barnett then walked Dwyer to the door. When Barnett finally let Gidget leave, she went out the front door, ran out onto Halsted, around the building and then down the alley to a gangway. While standing in the gangway, she heard some moaning, turned around and saw defendant and another guy beating Nuccio. Defendant then said, "It's useless," turned and looked around him, pulled out a silver gun and fired approximately six shots at Nuccio.

In May 1987, the police contacted Gidget, and she told them about defendant's actions in the alley, but did not mention Barnett or Tim Taylor or what had happened in defendant's apartment because she was scared. In fact, she never told anyone about what she had witnessed in the apartment, even when she testified before the grand jury, until the morning she was to testify at trial.

Thomas Bentley then testified on behalf of the State that on the evening of November 28, 1986, and into the early morning hours of November 29, he was drinking at various taverns, with the Fifth Wheel as his last stop. After he had been at the Fifth Wheel for a while, defendant came up to him and asked him to help him do something. The two of them went out of the rear door of the tavern and up to defendant's third-floor apartment. When Bentley walked into the apartment, he saw a guy lying on the floor. He and defendant picked up the guy and carried him downstairs. The guy had a beard, stringy looking hair and was "bruised up and stuff." After Bentley and defendant picked up Nuccio, Bentley noticed blood on the floor. They then carried Nuccio down the stairs and out into the alley behind the Fifth Wheel, where they set him down. Bentley then went back into the tavern and continued drinking. Bentley testified that he did not think he was carrying a dead body. Rather, he thought that the guy had fallen and had been injured.

On cross-examination, Bentley testified that on the night in question he had had approximately 12 drinks before arriving at the Fifth

Wheel and then had about 12 more drinks once there. He did not see defendant until approximately 3:30 a.m. He never asked defendant any questions about the body and never went to the police. It was not until the police threatened to arrest him for Nuccio's murder the Tuesday before trial was to begin in June 1988 that Bentley told them what had happened on the morning of the murder.

John Stiltner then testified that he lived across the alley from the Fifth Wheel in November 1986 and sharpened tools and saws for a living in his garage, which abutted the alley. Approximately 4:15 a.m. on November 29, 1986, while Stiltner was doing some work in his garage, he heard a noise that sounded like a truck with chains banging on it go north down the alley. He did not go out to investigate the source of the noise. Later that morning, he saw police cars, an ambulance and a fire truck at a vacant lot a short distance away. When he walked over to the lot to see what was happening, he saw the police picking up a man's body.

Detective Robert Lane of the Chicago police department testified that, upon learning that Nuccio had been staying at defendant's apartment, he went to defendant's apartment on December 1, 1986, to obtain some background information on Nuccio. Upon entering defendant's apartment, Lane sat at the kitchen table. He noticed that the walls, woodwork and "floor location around the circumference of the room" appeared to have been freshly painted. Defendant told Lane that on Thanksgiving day, he had driven Nuccio to someone's house, dropped him off and waited for him outside the house. He and Nuccio then went to the Fifth Wheel and "got high." The following day, defendant met Nuccio approximately 4 p.m. and went to the Fifth Wheel, where they stayed until approximately 9 p.m. They then stopped at some other taverns and returned to the Fifth Wheel, which was crowded by that time. Defendant lost sight of Nuccio approximately 1 a.m. Defendant further told Lane that he had heard on Saturday night that someone in the neighborhood had been killed, but did not find out until Monday that it had been Nuccio.

Officer Thomas Coughlin of the Chicago police department then testified that on December 2, 1986, approximately 8:30 p.m., he arrested defendant for unlawful use of a weapon (UUW). The arrest occurred when Coughlin stopped a car driven by defendant for erratic driving. When defendant stepped out of the car, Coughlin noticed a bulge and the handle of what appeared to be a gun in his pants pocket. Upon removing the gun, Coughlin noticed that it was a .38 caliber revolver with no serial number. When Coughlin asked defendant where he had obtained the gun, defendant told him that he had

received it from Nuccio approximately a week before Nuccio was murdered. Coughlin handcuffed defendant and brought him to the police station.

As alibi witnesses, Janet Light, a bartender at the Fifth Wheel, and Susan Maher, a patron, testified that defendant was passed out at 4 a.m. on the morning Nuccio was killed. On cross-examination, Maher further stated that she had been standing near Barnett's office that morning and never saw defendant go in there. Following closing arguments, the jury retired and returned with a verdict of guilty. Judgment was entered on the verdict, and following a sentencing hearing, the trial court sentenced defendant to a prison term of 36 years. Defendant's timely appeal followed.

■■ ■ Initially, defendant argues that he was not convicted of murder beyond a reasonable doubt. Defendant predicates this argument on his contentions that the State failed to introduce any physical evidence directly connecting him to the murder; the testimony of Sean Dwyer, Gidget Robbins and Thomas Bentley was contradictory and self-impeaching; and he had established a convincing alibi. It is well established that a judgment of conviction will not be reversed on review unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. Upon review, the findings of the trier of fact, including the credibility of witnesses, are entitled to great weight. However, the reviewing court will reverse the conviction if the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 225.

The first contention raised by defendant is the lack of physical evidence connecting him to Nuccio's murder. Specifically, defendant refers to the facts that the murder weapon was not introduced into evidence, no fingerprints were found on Nuccio's truck, and no evidence of bloodstains was found in defendant's apartment or in the alley. Neither defendant nor the State provides any case law as to the importance or unimportance of physical evidence. Instead, each side relies on the balancing of facts to support its position.

■ With respect to the gun, defendant argues that not only was the weapon used to murder Nuccio not introduced, the testimony of the State's ballistics expert contradicted the State's theory that a small .22 caliber handgun had been used. In making this argument, defendant misrepresents the ballistics expert's testimony. Earnest Warner, firearms examiner, testified that the seven bullets recovered from Nuccio's body were .22 caliber bullets and had been fired from

either a Jennings automatic pistol or a Marlon rifle. Further, based on the frequency with which those two weapons are used in the Chicago area, Warner stated that it is more likely that the bullets were fired from a rifle. Thus, Warner did not contradict the State's position that the bullets had been fired from a .22 caliber handgun. He merely stated that Marlon rifles are the more commonly used weapon in the Chicago area.

■ Regarding the lack of fingerprints, the State counters that the absence of fingerprints indicates nothing more than that defendant was careful not to leave any fingerprints on the truck. The State responded similarly to defendant's point that there were no bloodstains at the scene of the crime. With respect to the bloodstains, Detective Robert Lane testified that on December 1, 1986, when he and his partner went to the Fifth Wheel to obtain background information on Nuccio, defendant allowed them to enter his apartment and talked with the detectives in the kitchen. At the time, Lane smelled paint and noticed that the walls, woodwork and the "floor location around the circumference of the room" appeared to be freshly painted. In fact, Lane accidentally stepped into some of the paint and it was still sticky. Three days later, Lane interviewed defendant again at police headquarters. During that interview, defendant stated that he had been remodeling his apartment for the holidays for the "past week or so" and had painted the walls a couple of weeks earlier. However, in contradiction to defendant's statement that he had painted his walls in the middle of November, both Sean Dwyer and Gidget Robbins testified that they did not observe or smell fresh paint in defendant's apartment on November 29, five days prior to Detective Lane's interview of defendant. Based on the testimony of Detective Lane, Dwyer and Gidget, the State contends that the jury could reasonably have believed that defendant had painted his apartment after the shooting to cover any bloodstains. With respect to the lack of bloodstains in the hallway or in the alley, the State notes that there was no evidence that there were or were not bloodstains present. However, even if there were no bloodstains present, the State contends that two days had elapsed from the murder to Detective Lane's first visit to defendant's apartment, during which time the scene could have been cleaned. It is reasonable for the jury to have believed that the crime scene had been cleaned to remove all traces of blood.

■ Next, defendant contends that the eyewitness testimony of Gidget Robbins and Sean Dwyer was contradictory, self-impeaching and incredible. The State admits that there were inconsistencies, but contends that they were regarding irrelevant matters which occurred

before and after the shooting, and that the relevant facts regarding the actual shooting were consistent. Any conflicts or inconsistencies in the testimony of witnesses go to questions of the weight of the evidence and the credibility of the witnesses. These questions, as well as any inferences to be drawn from the evidence, are within the province of the jury and, on review, the court will not substitute its judgment for that of the jury unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

In support of his position, defendant cites to the following alleged inconsistencies between Gidget's testimony and Dwyer's testimony, the two eyewitnesses to the shooting in defendant's apartment: (1) Gidget stated she met up with Dwyer in a neighborhood park and they walked together to defendant's apartment; Dwyer stated that he met up with Gidget on the stairs going up to defendant's apartment; (2) Gidget saw cocaine in defendant's apartment, but did not see anyone using it; Dwyer stated that everyone was snorting cocaine; (3) Gidget stated that after the shooting, neither she nor Dwyer said anything; Dwyer testified that he and Gidget started to scream; (4) Gidget testified that after the shooting, Barnett threatened them, took Dwyer by the back of the neck, walked him to the door and told him to leave and not to look back; Dwyer testified that when he walked up to Barnett and asked if he could leave, Barnett told him to wait, then when he let him leave a few minutes later, he gave him some cocaine and told him not to come back for a while; and (5) Gidget stated that she had heard three or four shots; Dwyer testified that he had heard six to eight shots. In addition, defendant contends that there were inconsistencies in the testimony as to the time at which the shooting occurred.

■■ Regarding the first four inconsistencies, these points are irrelevant as to the actual shooting and their variance can reasonably be attributed to the 1½-year interval between the occurrence and trial. The fifth alleged inconsistency is based on a misrepresentation of the record. Gidget did not testify unequivocally that she had heard only three or four shots. She added that there may have been more. Similarly, Dwyer's answer was also an approximation. Considering the circumstances, the jury could reasonably have concluded that Gidget and Dwyer may not have kept an accurate count of the shots fired. As to the alleged discrepancies regarding the time the shooting occurred, Gidget testified that it was "later than 2:30 a.m.," Dwyer testified it was just before 4 a.m.; Chris Robbins testified that she heard a loud "bang" at approximately 5 a.m. and Stacy Conrad testified that she

heard a loud noise between 5:30 a.m. and 6 a.m. There is no inconsistency between Gidget and Dwyer's testimony because Gidget never was explicit as to the time. Regarding the testimony of Chris and Stacy, there is no evidence that the loud noise which they heard was connected to the shooting. It is reasonable for the jury to have believed that the later single noise was unrelated.

In responding to defendant's claim that the inconsistencies created a reasonable doubt, the State refers to 11 consistencies between the testimony of Gidget and Dwyer regarding the actual shooting in the apartment: both entered defendant's apartment together through the rear door; Nuccio was intoxicated and slumped over in a chair; Barnett and Tim Taylor were present initially and were in defendant's kitchen; both Gidget and Dwyer saw Taylor burst into the apartment through the front door and commence shooting Nuccio; they both fell to the kitchen floor; defendant and Barnett would not let them leave immediately; Barnett let Dwyer leave first; and Barnett threatened them to keep quiet about what they had seen. In our view, neither the lack of physical evidence nor the minor inconsistencies between the testimony of Gidget and Dwyer render the evidence so unreasonable, improbable, or unsatisfactory as to justify this court's reversal of the jury's determination of guilt beyond a reasonable doubt.

■ Defendant next contends that the inherent improbability of the testimony of Dwyer, Gidget and Thomas Bentley renders the evidence insufficient to support a judgment of guilty beyond a reasonable doubt. Regarding Dwyer, defendant argues that Dwyer chose to testify only because he realized it would benefit his then pending criminal convictions. Defendant then proceeds to quote from the record a portion of Dwyer's testimony where he indicates that he would like to receive some consideration from the State for his testimony. However, as Dwyer's complete statement on cross-examination indicates, Dwyer's wish and the actual circumstances are not synonymous.

> "[DEFENSE COUNSEL]: Sean, do you expect or hope to get any consideration or help from the State for your testimony in this case?
>
> [DWYER]: No, I don't.
>
> [DEFENSE COUNSEL]: You don't expect anything at all?
>
> [DWYER]: I was not told nothing of it.
>
> [DEFENSE COUNSEL]: Well, you haven't been told anything of it. Do you hope that you will get something when it's all over.

* * *

[DWYER]: Well, any man that's locked up would hope for the best.

[DEFENSE COUNSEL]: So you're hoping you receive some consideration for what you're doing?

[DWYER]: Yes, could you [sic] say that."

In our view, Dwyer's unjustified hope does not render his testimony improbable or suspicious.

■ Regarding the testimony of Gidget Robbins, defendant contends that because on two occasions Gidget testified under oath to completely contradictory versions of the same event, her testimony is highly suspect and should be disregarded. Specifically, when Gidget testified before the grand jury, she stated that she had witnessed defendant shoot Nuccio in the alley behind the Fifth Wheel. At that time, she did not testify as to the events which had taken place inside defendant's apartment. It was not until the morning that she was to testify at trial that Gidget told the State's Attorney that she had witnessed Tim Taylor shoot Nuccio inside defendant's apartment. Contrary to defendant's argument, Gidget's testimony did not present two contradictory versions of the same event. Her testimony as to the events which took place in the apartment and her testimony as to the events which took place in the alley are compatible and are corroborated by the testimony of Sean Dwyer and Thomas Bentley. When queried at trial by the State as to why she had waited so long to testify as to the events in the apartment, Gidget stated, "Because Don Barnett. I mean, he is a mad man." She further indicated that Barnett had threatened her family.

■ Defendant also refers to the fact that Gidget did not talk to the police about the shooting until they contacted her in May 1987 and threatened to charge her with the murder. The question of whether Gidget's testimony is improbable or incredible because of this time lapse is one of credibility which goes to the weight of the evidence. This determination is to be made by the trier of fact. Considering the evidence of threats made by Barnett to Gidget and to her family, the jury reasonably could have believed that Gidget was too frightened to contact the police, and once they contacted her, too frightened to implicate Barnett.

Defendant further contends that Thomas Bentley's testimony was improbable and that, as an accomplice, Bentley had a strong motive to implicate defendant. Bentley testified that between the hours of 7 p.m. on November 28, 1986, and 3 a.m. on November 29, 1986, he had consumed approximately 24 tequila and orange juice drinks. Ap-

proximately 3:30 a.m., defendant approached Bentley in the Fifth Wheel and asked him to help him with something upstairs. Bentley went to defendant's apartment, and when he entered, saw a man lying on the floor. Defendant asked Bentley to help him carry the man downstairs. Bentley agreed without asking any questions. When he lifted the man and saw blood on the floor, he figured that "something had happened." Bentley never asked any questions, carried the man to the vacant lot behind the building, and went back inside to the bar. Bentley never went to the police and was never questioned about the murder until the Tuesday before trial in June 1988. On that day, three detectives entered a bar where Bentley was drinking, handcuffed him, and put him in a car, telling him that he was going to be charged with murder. At that point, Bentley told them what had happened in the early morning hours of November 29, 1986. Bentley was never charged with any crime connected to the murder.

■■ Defendant argues that because Bentley was released from police custody after he had implicated defendant, Bentley's testimony is highly suspect. The record is void of any evidence to support defendant's suggestion that the police made any type of special arrangement with Bentley in exchange for his statement or that Bentley had had any hope or expectation of such an arrangement. The jury was aware of the circumstances under which Bentley talked to the police as well as Bentley's involvement in the events surrounding Nuccio's death. These circumstances impact on the credibility of Bentley's testimony, a determination which is reserved for the trier of fact (*People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 525), and which will not be disturbed on review unless the evidence is so improbable, unbelievable or unsatisfactory as to raise a serious question as to defendant's guilt. (*People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.) In light of the totality of circumstances, that situation does not arise in the present case.

■■ Next, defendant argues that the State failed to prove beyond a reasonable doubt that defendant had participated in a conspiracy with Barnett and Taylor to murder Nuccio. The impact of this contention on defendant's conviction of murder is unclear. Proof of a conspiracy is not necessary to sustain defendant's conviction. He was never indicted or convicted of a conspiracy to commit murder. Moreover, defendant offers no legal authority in support of this argument. He merely reiterates testimony and sets forth his own legal conclusion. For these reasons, we decline to further address this contention. See *People v. Hendricks* (1986), 145 Ill. App.

3d 71, 495 N.E.2d 85, *rev'd & remanded on other reasons* (1990), 137 Ill. 2d 31, 560 N.E.2d 611.

■ Finally, with respect to the alibi testimony, the weight to be given alibi evidence is a question of credibility for the trier of fact, who has no obligation to accept the alibi testimony over positive identification of the accused. (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.) In the present case, Janet Light, bartender at the Fifth Wheel, and Susan Maher, patron at the Fifth Wheel on the morning of the murder, testified as alibi witnesses. Light testified that defendant had passed out approximately 2 a.m. on the morning of the murder and was still passed out when she left shortly before 4 a.m. However, Light also stated that defendant could have left the bar during that time without her knowledge because the bar was very crowded. Moreover, Light's testimony is contradicted by the testimony of Chris Robbins, Gidget Robbins, Sean Dwyer and Thomas Bentley.

■ Susan Maher testified that she arrived at the Fifth Wheel approximately 2:15 a.m. on November 29, 1986, ordered a drink and was talking to some friends when she saw defendant walk through the room. He stopped and talked to Maher and her friends and danced with Maher. He then left and mingled with the others in the bar. The bar was crowded, and Maher did not remember whether she saw him again before the tavern closed at 4 a.m., at which time she saw him sitting at a table with his head in his hands. Similar to Light's alibi testimony, Maher's testimony indicates that there were time periods within which she did not see defendant. In our view, it is not unreasonable for the jury to have viewed these facts as either compatible with the testimony of Gidget and Dwyer or to have elected to accept Gidget's and Dwyer's testimony instead of that of Light and Maher based on the credibility of the witnesses.

Next, defendant contends that the trial court committed reversible error when it admitted evidence of a weapon which was not connected to the murder, evidence of unrelated criminal offenses committed by defendant and evidence of crimes of others. At trial, Officer Thomas Coughlin testified that on Tuesday, December 2, 1986, approximately 8:30 p.m., he and his partner pulled over an older model white Cadillac which was swerving back and forth as it was heading south on Halsted. Defendant was driving the car. When defendant stepped out, Coughlin noticed a bulge and the handle of what appeared to be a gun in defendant's right rear pants pocket. Coughlin then removed the gun from defendant's pocket and discovered that it was a .38 caliber revolver. Defendant was then placed under arrest and taken to police headquarters. At headquarters, Coughlin noticed

that the gun had no serial number and asked defendant where he got it. He told the officer he had received the gun from Nuccio, who had been living with him. On cross-examination, Coughlin stated that he did not recall defendant having said he had bought the gun from Nuccio, just that he had "got it" from Nuccio approximately one week before.

Defendant contends that it was highly prejudicial and of no probative value to introduce the .38 revolver into evidence when it was never connected to Nuccio's murder and to elicit testimony regarding defendant's arrest for the UUW charge. In response, the State argues that the evidence was admissible to show defendant's relationship to Nuccio, defendant's consciousness of guilt, defendant's attempt to destroy the weapon and the continuing narrative of the original crime.

 Regarding introduction of the .38 caliber revolver, as a general rule, a weapon may not be introduced into evidence unless there is proof to connect it to the defendant and the crime (*People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528) or unless the defendant possessed the weapon when arrested for the crime, thereby evidencing details of the arrest. (*People v. McQueen* (1983), 115 Ill. App. 3d 833, 470 N.E.2d 921.) In the present case, it is undisputed that the .38 caliber revolver was not used to murder Nuccio. Further, the weapon was not confiscated at the time defendant was arrested for Nuccio's murder. It was confiscated when he was stopped for driving in an erratic manner and arrested on the UUW charge. Accordingly, neither of the recognized exceptions applies.

 Regarding the introduction of the defendant's UUW arrest, evidence of collateral crimes is admissible if relevant to show knowledge, intent, motive, design, plan or identification. It is not admissible to show defendant's propensity to commit crimes. (*People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.) The State addresses the introduction of the .38 caliber revolver and the UUW charge together. First, the State contends that the evidence tended to establish that defendant and Nuccio had lived together above the Fifth Wheel. The State bases this rationale on the statement that during the police officers' initial interview with defendant at his apartment on December 1, 1986, defendant's "reaction was that he hardly knew [Nuccio]." This interpretation of the record is not grounded in fact. During the interview on December 1, 1986, defendant told the officers that he had been with Nuccio on the previous Thursday and Friday. Moreover, several witnesses testified to the fact that Nuccio was living with defendant on the night he was murdered. Thus, introduction of the

.38 caliber revolver was not necessary to explain the relationship between defendant and Nuccio.

 The State next contends that evidence of the .38 caliber revolver and the UUW arrest tended to "explain defendant's consciousness of guilt and attempt to destroy the weapon." The facts do not support this explanation. There is no evidence that defendant was attempting to destroy the weapon. It was plainly visible in his pocket when he got out of the car after being stopped by the police. Certainly, he could have placed it out of plain view if he was attempting to dispose of it. Equally unpersuasive is the State's claim that defendant's possession of the gun demonstrated his "attempt to clean the apartment of every vestige of [Nuccio's] existence." As stated, the fact that Nuccio had lived with defendant was common knowledge and testified to by several witnesses. There would be no need for defendant to remove Nuccio's belongings from his apartment.

In reliance on *People v. Darby* (1978), 58 Ill. App. 3d 294, 374 N.E.2d 229, the State further argues that evidence of the .38 caliber revolver was relevant as part of a continuing narrative of the original crime. In *Darby*, defendant was charged with rape and indecent liberties of the 14-year-old sister of a friend. At trial, the victim's older sister testified that she had called defendant from a friend's house between 6 and 6:30 p.m. and had asked him to deliver a marijuana cigarette to her house. The victim testified that defendant arrived at her home approximately 6 p.m. and asked for her sister. When she told him that her sister was not at home, he came into the house and raped her. When he left, she called her sister and told her what had happened. Following a jury trial, defendant was found guilty of indecent liberties, but not of rape. On appeal, defendant argued, *inter alia*, that introduction of evidence concerning the marijuana was irrelevant and inflammatory. The court held that defendant had waived the issue on review by failing to object at trial. However, even if the issue had not been waived, the court stated that the evidence was admissible because it had a "definite relation to the continuing narrative of events" which took place on the evening of the alleged rape. (58 Ill. App. 3d at 298.) In reaching this conclusion, the court stated that the evidence "tended to show the close congruence in time between the older sister's call to the defendant requesting the marijuana and his arrival at the complainant's home. It also showed that the defendant more likely than not did visit the complainant's home in making the delivery and helped to establish his identity." 58 Ill. App. 3d at 298.

Unlike the situation in *Darby*, introduction of the .38 caliber revolver and the UUW charge in the present case did not continue the

narrative of events of the crime charged. First, the crime charged occurred on November 29. Defendant was stopped on December 2 for totally unrelated reasons. Second, the .38 caliber revolver was not in any way connected to the crime. Third, the UUW charge was also not connected to the crime. Accordingly, there is no evidence to support the State's contention that introduction of the .38 caliber revolver and the UUW charge were properly introduced into evidence.

■ Although evidence of the .38 caliber revolver and the UUW charge was not properly admitted, we find that in light of the evidence adduced at trial to establish defendant's guilt, the admission into evidence of the .38 caliber revolver and the UUW charge could not have reasonably affected the verdict. (*People v. Jackson* (1990), 195 Ill. App. 3d 104, 551 N.E.2d 1025.) Gidget Robbins unequivocally identified defendant as the person who shot Nuccio in the alley. Thomas Bentley stated that he had helped defendant carry Nuccio's body from defendant's apartment to the alley behind the building. Sean Dwyer testified as to defendant's participation in the events in the apartment, and Officer Coughlin testified as to the fact defendant had newly painted his apartment two days after the shooting. Moreover, the testimony adduced at trial plus closing arguments repeatedly stated that Nuccio had been murdered with .22 caliber bullets. It was equally clear to the jury that the revolver taken from defendant was a .38 caliber revolver, thus eliminating any possible confusion by the jury. In addition, any inference that the jury may have drawn from the improperly admitted gun was significantly reduced by the fact that the gun was not submitted to the jury during deliberations. (*People v. Jackson*, 195 Ill. App. 3d 104, 551 N.E.3d 1025.) Accordingly, we find that the admission of the .38 caliber revolver and the UUW charge did not prejudice defendant so as to deny him his rights to a fair trial.

■ Defendant further argues that the trial court erroneously admitted evidence of general drug-related activity at the Fifth Wheel when there was no evidence that defendant had sold drugs. Evidence is relevant when it tends to prove a fact in controversy or renders a matter more or less probable. (*People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) Contrary to defendant's contention, we find that testimony as to the drug-related activity at the Fifth Wheel and defendant's participation in that activity as user, seller and buyer was properly introduced to establish the motive to murder Nuccio, *i.e.*, defendant thought that Nuccio was an undercover narcotics agent.

Defendant further contends that the trial court erred in admitting Chris Robbins' testimony that she had seen defendant steal some of

Nuccio's cocaine. Defendant claims that this unsubstantiated accusation suggests his bad character and places an unfair burden on him to defend himself against a crime with which he was not charged. The State responds that the evidence of the cocaine theft was properly introduced to support the State's theory that Nuccio's murder was widely connected to drug dealing and drug using.

Evidence of criminal acts of misconduct by an accused which are unrelated to the charge is inadmissible unless it has substantial independent relevance, such as to show motive, intent, identity, the absence of mistake or accident, or the existence of a common scheme or design. (*People v. Sanders* (1978), 59 Ill. App. 3d 650, 375 N.E.2d 921.) At trial, Chris Robbins testified that when she was in defendant's apartment in the early morning hours of November 28, she saw defendant pretend to hide Nuccio's cocaine in a drain pipe, but actually put it in his pocket. A few minutes later, when Nuccio asked defendant to get the cocaine, defendant turned on the water and told Nuccio he had accidentally washed the cocaine down the drain. In reliance on *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 528 N.E.2d 1371, the State argues that this testimony is relevant to demonstrate the relationship between Nuccio and defendant and the motive for Nuccio's murder. In *Whitlock*, defendant was convicted of murder. On appeal, he alleged, *inter alia*, that testimony of prior drug sales between himself and the victim's husband, who had also been murdered, was irrelevant and prejudicial. The court held that the evidence was properly admitted to establish that the motive for the murder was a bad drug deal.

In the present case, we are not persuaded that evidence of defendant's alleged theft of cocaine from Nuccio was relevant to establish motive. The State did not argue that the motive for murdering Nuccio was to gain control of his drugs. Instead, the State argued that the motive for the murder was the belief of defendant, Barnett and Taylor that Nuccio was an undercover narcotics agent. Accordingly, we find that the trial court erred in admitting evidence of defendant's alleged theft of cocaine. However, even though the evidence was inadmissible, it does not provide grounds for reversal. Upon examination of the entire record, there is no reasonable probability that defendant would not have been convicted if the cocaine theft incident had not been admitted. *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.

Next, defendant argues that he was substantially prejudiced and denied his rights to a fair trial by the State's inflammatory comments during closing argument. In response, the State contends that the

comments were proper as either responsive to comments made by the defense or as reasonable inferences to be drawn from the evidence. In the alternative, if they were improper, the State contends that any error was cured by the court's instructions to the jury.

■■ ■ A prosecutor is given great latitude during closing argument, and the propriety of his comments is within the trial court's discretion. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.) The prosecution may base the closing argument on invited comments and reasonable inferences drawn from the evidence. Further, the prosecutor may denounce defendant's activities and urge that justice be administered. In order for a prosecutor's remarks to constitute grounds for reversal, they must be of "substantial magnitude" when viewed in the context of the entire record to have prejudiced defendant's rights to a fair trial. (*People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288.) Generally, any alleged prejudice to defendant will be cured when the trial court instructs the jury that closing arguments are not evidence and that they should disregard any comments made during closing argument which are not based on the evidence. (*People v. Scott*, 194 Ill. App. 3d 634, 551 N.E.2d 288.) In the present case, this instruction was given by the trial court.

■ Initially, defendant notes several misstatements of the evidence made by the State during closing argument. The State said Susan Maher, one of the alibi witnesses, had stated that she had been watching defendant every minute at the Fifth Wheel on the morning of Nuccio's murder. In fact, Maher testified that after she had danced with defendant shortly after she arrived, she did not notice him again until closing at 4 a.m. Next, the State commented that John Stiltner testified that he had heard and seen Nuccio's tow truck drive down the alley behind the Fifth Wheel on the morning of the murder. In fact, Stiltner did say on direct that he had seen and heard the tow truck. However, on cross-examination, he clarified his statement by saying that he had heard a truck go down the alley, but had not seen Nuccio's truck until several hours later when it was surrounded by police about two blocks away. Further, the State commented that on December 1, 1986, when the police arrived at defendant's apartment to interview him, defendant "put Detective Lane in the kitchen. Wouldn't let him into the front room." In fact, there is no indication that Detective Lane had been prevented from going into the front room. Although the aforementioned comments by the State were misstatements of the evidence, we are not persuaded that any of them, individually or cumulatively, rise to the level of reversible error. Moreover, the jury heard the evidence and was instructed that the evi-

dence is to take precedence over comments made during closing argument.

■■ In addition, defendant contends that the State's comments regarding defendant's lack of surprise upon hearing about Nuccio's death from the police officers on December 1 was prejudicial. When commenting on defendant's reaction to the news, the State argued, "Now, if he was innocent what would he do when Detective Lane came, what would he do, what would an innocent man do? He said oh, my God, my friend was killed, I'm so sorry, what can I do, what is his wife's name, I will call her up, here is his luggage which he left behind." The State's comment was predicated on Officer Coughlin's testimony as to defendant's reaction to news of Nuccio's death. Although the State may have been overzealous in its comments, we do not find the comments to have been either inflammatory or prejudicial.

■■ Next, defendant argues that the State improperly commented that when defendant was arrested on the UUW charge, he was on his way to dump the .38 caliber revolver. Defendant has waived this objection by failing to object to the prosecutor's remarks during closing argument. *People v. Kloiber* (1981), 95 Ill. App. 3d 1061, 420 N.E.2d 870.

■■ Finally, defendant contends that he was prejudiced by the State's comments that drug dealers controlled and terrorized the neighborhood. However, we find that this comment was within the bounds of accepted prosecutorial argument as a comment on the evidence. Chris Robbins, Gidget Robbins and Sean Dwyer each testified that threats against their lives by either Barnett or defendant prevented them from going to the police about Nuccio's death. Chris, Gidget and Sean further testified as to the drug trafficking which pervaded the neighborhood. Accordingly, because the State's comments during closing argument were either harmless error or were reasonable inferences drawn from the evidence, we conclude that they fail to provide grounds for reversal, either individually or cumulatively.

Next, defendant argues that the trial court committed reversible error when it refused to give an accomplice instruction regarding the testimony of Sean Dwyer and Tom Bentley. At the jury instruction conference, defendant requested that the following accomplice instruction be given with respect to the testimony of Thomas Bentley and Sean Dwyer:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution.

It should be carefully examined in light of the other evidence in the case."

The State objected to the instruction on the ground that there was no evidence of accomplice testimony. The court denied the instruction, stating that the "closest thing" Bentley could have been charged with was obstructing justice and that Dwyer had been "hooked to his shoes when it happened" and had been "threatened concerning what he supposedly did not see."

■■ The test used to determine whether a witness was an accomplice is whether the witness could have been indicted as either a principal or on an accountability theory. (*People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31.) If this test is met, the defendant is entitled to an accomplice instruction notwithstanding the witness' denial of involvement. (*People v. Winston* (1987), 160 Ill. App. 3d 623, 513 N.E.2d 1121.) In the present case, defendant does not contend that either Bentley or Dwyer was a principal. Rather, he contends that probable cause existed to indict them under an accountability theory. In order to hold an individual accountable for the actions of another, the State must prove beyond a reasonable doubt that: (1) defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) defendant participated either before or during the commission of the crime; and (3) defendant must have had the concurrent, specific intent to promote or to facilitate the commission of the offense. (*People v. Cooper* (1987), 164 Ill. App. 3d 734, 518 N.E.2d 260.) Although accountability may be proven by circumstantial evidence, mere presence or acquiescence is not sufficient to render a defendant accountable. *In re T.O.* (1989), 187 Ill. App. 3d 970, 543 N.E.2d 969.

In the present case, probable cause does not exist to indict either Sean Dwyer or Thomas Bentley on an accountability theory. With respect to Dwyer, there is no evidence that Dwyer participated in the planning or the commission of Nuccio's murder anyway. Dwyer simply happened to be present at defendant's apartment when Nuccio was killed. He attempted to flee, but was stopped by both Barnett and defendant, and was threatened with harm if he told anyone what he had seen. The fact that Barnett allegedly gave Dwyer some cocaine when Dwyer left does not indicate that Dwyer was sharing in the proceeds of the crime as defendant suggests. Not only is there no evidence that the cocaine was proceeds of the crime, there is no evidence, other than Dwyer's speculation, that the cocaine Barnett allegedly gave Dwyer had even belonged to Nuccio.

Regarding Thomas Bentley, there is no evidence that Bentley had the requisite intent to promote or to facilitate the crime. Bentley testified that when he helped defendant carry Nuccio to the alley, he thought there had been a fight and that defendant wanted Nuccio out of his apartment. Moreover, considering the amount of alcohol Bentley had consumed that evening, it is unlikely he even realized what he was doing. This is further evidenced by the fact that after he had helped defendant carry Nuccio downstairs, he simply went back into the Fifth Wheel and continued drinking.

Even if Bentley and Dwyer could have been indicted for the offense, the trial court's refusal to give the accomplice jury instruction was not reversible error. (*People v. Clark* (1979), 73 Ill. App. 3d 85, 391 N.E.2d 576; *People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894.) In *Clark*, although the reviewing court found that the witness conceivably could have been charged with theft as was the defendant, the reviewing court held that the trial court's refusal to give the accomplice jury instruction was harmless error because the witness had merely testified that she had helped defendant load the stolen property into his car, not knowing the property was stolen; the witness' testimony was not critical to the case; no attempt was made during cross-examination to explore any possible interest or bias of the witness; and the general jury instruction regarding credibility of witnesses had been given. Similarly, in *Dowd*, the reviewing court did not find that the trial court's failure to give an accomplice jury instruction deprived the jury of "essential guidance in its evaluation of the evidence" in light of the fact that the jury had been instructed as to its duty to evaluate the credibility of witnesses generally. *Dowd*, 101 Ill. App. 3d at 845.

In the present case, as in both *Clark* and *Dowd*, the general jury instruction as to the credibility of the witnesses was given to the jury. Further, as in *Clark*, there was no direct proof of a motive for either Bentley or Dwyer to testify falsely, nor did the testimony of either incriminate defendant in the shooting of Nuccio in the alley. Accordingly, even if Bentley and Dwyer could have been indicted for the offense, the trial court's refusal to give an accomplice instruction does not constitute reversible error. Defendant's reliance on *People v. Carreon* (1987), 162 Ill. App. 3d 990, 516 N.E.2d 372, *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31, *People v. Winston* (1987), 160 Ill. App. 3d 623, 513 N.E.2d 1121, and *People v. Baker* (1983), 110 Ill. App. 3d 1015, 443 N.E.2d 270, is misplaced. In each of these cases, the defendant was present before, during and after the crime and either aided in the completion of the offense or shared in the proceeds.

Neither of these conditions is present in the case at bar. Accordingly, because neither Dwyer nor Bentley was an accomplice, the trial court properly refused to give the accomplice instruction.

Finally, defendant argues that the trial court committed reversible error when it admitted hearsay statements into evidence under the coconspirator exception to the hearsay rule. Specifically, defendant refers to testimony by Gidget Robbins and Sean Dwyer as to statements made by Barnett and Tim Taylor that they thought Nuccio was a cop. Defendant claims that such evidence does not fall within the coconspirator exception to the hearsay rule because the State failed to establish a *prima facie* case of conspiracy based on nonhearsay evidence. Defendant further argues that even if such a conspiracy did exist, the statements were not made in furtherance of a conspiracy.

Under the coconspirator's exception to the hearsay rule, the declarations of a coconspirator made in furtherance of the conspiracy are admissible against a defendant even though they were made outside of defendant's presence. (*People v. Miller* (1984), 128 Ill. App. 3d 574, 470 N.E.2d 1222.) In order to rely on this exception, the State need not charge the crime of conspiracy, it need only establish the existence of a *prima facie* case of conspiracy by a preponderance of the nonhearsay evidence that two or more persons were engaged in a common plan to accomplish a criminal goal. (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 461 N.E.2d 631.) The existence of an agreement, the essence of a conspiracy, may be proved by circumstantial evidence. However, that proof must be sufficient, substantial and independent of the declaration made. (*People v. Duckworth* (1989), 180 Ill. App. 3d 792, 536 N.E.2d 469.) Statements made in furtherance of a conspiracy are those which had the effect of advising, encouraging, aiding or abetting its perpetration. *People v. Miller* (1984), 128 Ill. App. 3d 574, 470 N.E.2d 1222.

In the present case, the trial court found that an agreement to murder Nuccio was evidenced by defendant's statement at the Fifth Wheel on December 3, 1986, overheard by Chris Robbins, "I did it. We all did it. I killed T.J. [Nuccio]." When defendant repeated this statement, Barnett walked over to him, grabbed him by the neck and told him to shut up before he got them all in trouble. In our view, this evidence coupled with the testimony of Gidget Robbins and Sean Dwyer that neither Barnett nor defendant had made any attempt to apprehend Taylor when he shot Nuccio in the apartment and both Barnett and defendant blocked Gidget and Dwyer when they attempted to leave defendant's apartment is sufficient to establish a *prima facie* case of conspiracy.

■■ However, in order to be admissible under the exception, the comments must have also been made in furtherance of the conspiracy. In our view, the State has failed to show how comments by Taylor and Barnett that they thought Nuccio was a cop had the effect of advising, encouraging, aiding or abetting the perpetration of the murder. Accordingly, because the hearsay statements made by Barnett and defendant were not made in furtherance of a conspiracy, the trial court erred in admitting those statements under the coconspirator's exception to the hearsay rule.

Although the trial court improperly admitted the statements, based on the eyewitness testimony of Gidget Robbins as to defendant's act of shooting Nuccio in the alley, and the corroborating statements of Dwyer and Bentley, we find that admission of those statements could not reasonably have affected the verdict. (*People v. Baker* (1982), 110 Ill. App. 3d 1015, 443 N.E.2d 270.) Therefore, any error was harmless.

Based on the aforementioned, the judgment of the trial court is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.