(No. 48177.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. KEITH WILLIAMS, Appellee.

*Opinion filed November 24, 1976.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellee.

MR. JUSTICE CREBS delivered the opinion of the court:

The defendant was convicted by a jury of murder and attempt (armed robbery) and sentenced to serve concurrent terms in the penitentiary of 25 to 45 years for murder and 5 to 10 years for attempt. The Appellate Court for the First District reversed the convictions, holding that the defendant was not proved guilty beyond a reasonable doubt. (*People v. Williams,* 34 Ill. App. 3d 136.) We have granted the State's petition for leave to appeal.

The indictment charged that the defendant, Joe Thomas, Ulysses Murphy and Larry Jones committed the offense of murder by shooting Ernest Bradley and also committed the offense of attempt by attempting to take property from Bradley while threatening him with a dangerous weapon. The defendant was tried separately from the other individuals.

Thomas Gaynor, a Chicago police officer, testified that he and his partner responded to a call on the 6400 block of South Greenwood Street at approximately 5:30 p.m. on December 30, 1970. Upon arriving at the scene, the officers observed a taxicab which had collided with a parked car on the west side of the street. The driver of the

cab, later identified as Ernest Bradley, was slumped over the steering wheel of the cab. Officer Gaynor observed that the window on the driver's side of the cab was shattered and that there were five or six holes in the windshield of the cab.

Claude Wiley, an investigator for the Chicago police department, testified that he arrived on the scene after Bradley's body had been removed from the cab. Wiley observed that the windshield of the cab had been struck by a shotgun blast, that the left front door window had been shattered, and that shattered fragments of glass were lying on the front seat of the taxicab. Wiley found one shotgun pellet casing near the left front fender of the cab and one or two casings near the left front door. Wiley also discovered some shotgun pellets on the floor of the cab. The witness further testified that he viewed Bradley's body at the hospital and noted that the body had several wounds in the left rear shoulder area.

Dr. Jerry Kearns testified that he is a pathologist and that he examined the body of Ernest Bradley on December 30, 1970. Dr. Kearns observed several wounds on the left side of the victim's back just below the shoulder blade and recovered about eight shotgun pellets from the victim's body. The witness stated his opinion that Bradley's death was caused by a shotgun wound.

Tyrone Robinson, a 17-year-old high school student, testified that he and Nathaniel Nelson were walking along the 6400 block of South Greenwood Street on December 30, 1970. He stated that as they were walking south on the east side of Greenwood, he saw Ulysses Murphy walking toward them on the same side of the street. Murphy suddenly turned around and walked toward a gangway. Robinson testified that he then saw Murphy, Joe Thomas, Larry Jones and the defendant standing in the gangway. He further testified that the defendant was holding a rifle at this time. Robinson stated that he was about 10 feet away from the defendant when he, Robinson, saw the

rifle. When Robinson and Nelson passed the gangway, Robinson allegedly heard Murphy say, "Let's get this cab." Robinson testified that he and Nelson kept walking and that he, Robinson, turned around and saw Murphy walk into the street and begin waving his arms at an approaching taxicab. The witness further testified that he saw the defendant fire a shot at the cab as the vehicle was approaching Murphy. At the time the shot was allegedly fired, the defendant was standing at the street curb and Robinson was about two buildings past the defendant. Robinson stated that he saw the cab's windshield break and then observed the cab crash into another automobile. Robinson then entered a nearby building and observed the defendant by looking through a window in the door. The witness testified that he then saw the defendant walk several feet south and fire two shots at the side of the cab. Robinson saw the window on the driver's side of the cab break after the shots were fired. He then observed the defendant running north on Greenwood Street toward the gangway with the rifle in his hands.

Robinson's credibility was severely weakened upon cross-examination. He initially stated that he had been at school until about 3 p.m. on December 30, 1970, and that he had watched a basketball game at school from 3 p.m. to about 4 p.m. Upon further cross-examination, however, Robinson stated that he was not in school on the day in question and that he did not watch a basketball game. He testified that he participated in a basketball game at an area boy's club shortly before he observed the shooting of Bradley. Robinson then repeated that, after he saw Murphy walking toward him on Greenwood Street prior to the shooting, Murphy turned around before he reached Robinson and walked into the gangway. Robinson admitted, however, that he had testified differently on a prior occasion. He had previously stated under oath that he and Nelson walked past Murphy on Greenwood Street and that Murphy then turned around and followed them for a short

distance. Robinson, who had indicated on direct examination that he saw the defendant holding a rifle in his right hand, stated on cross-examination that he did not remember in which hand the defendant held the rifle. He then admitted that he had previously testified that the defendant held the rifle in his left hand. When asked which of his prior statements was correct, Robinson stated that the defendant held the rifle in his left hand. Robinson also admitted giving conflicting testimony concerning what he heard just prior to the shooting. On direct examination, he stated that he heard Murphy say, "Let's get this cab." Robinson conceded that he had previously testified that he had heard those words but that he did not know which of the four men in the gangway spoke the words. He then acknowledged that he had testified at still another time that he did not remember if he had heard any of the boys in the gangway say anything.

Robinson also testified on cross-examination that he was already inside the building looking out the door window when he saw the defendant fire the first shot at the cab. He then admitted that he had testified on five prior occasions, however, that he ran inside the building after hearing the first shot. The witness also conceded that he once testified, contrary to his testimony on direct examination, that he did not actually see the defendant fire the first shot.

Robinson also gave contradictory testimony with respect to the location of the building that he allegedly entered after walking past the gangway. He testified that the building was to the south of the gangway and was also south of the point from which the defendant had fired at the cab. On cross-examination, however, Robinson admitted that he had previously testified that the building was to the north of the gangway. He stated on cross-examination that his previous testimony was incorrect.

Robinson further testified on cross-examination that he did not remember seeing any person in the taxicab

other than the driver. He had previously testified, however, that he had seen a woman leave the cab after the shooting. Upon being informed of his previous testimony, Robinson stated that he now remembered that there had been a woman passenger in the cab. Robinson again gave conflicting testimony to the question of whether there was a light in the hallway of the building that he entered after the first shot was fired. He stated on cross-examination that there was no light, then admitted that he had previously testified that there was a light and finally testified that he did not remember if there was a light in the hallway.

Robinson also testified on cross-examination that he was walking on the sidewalk when he saw Murphy wave at the taxicab. He then acknowledged, however, that he once testified that he was already in the building when Murphy signaled the cab. In addition, Robinson stated that he had once testified, contrary to his testimony on direct examination, that he had seen five or six boys in the gangway on Greenwood Street.

Robinson further testified that the police picked him up for questioning several days after the shooting. Robinson initially told the police that he knew nothing about the shooting. When told that he was going to be charged with the murder, however, Robinson gave the police the defendant's name. The witness responded affirmatively when asked whether he had told the police about the defendant in order to save his "own neck."

The next witness called to testify by the prosecution was Nathaniel Nelson. He testified that he and Tyrone Robinson were walking south along the 6400 block of South Greenwood at about 5:30 p.m. on December 30, 1970. As he and Robinson walked past a gangway, Nelson observed the defendant, Joe Thomas, and two individuals known to him as "Popeye" and "Blood," standing in the gangway. Nelson stated that as he walked past the gangway he heard Popeye say, "Let's get this cab." The witness further testified that when he reached a point about 20

feet south of the gangway he heard the first of three shots. After Nelson heard the first shot, he looked to his rear and then began running. He stated that he saw the defendant and Blood standing between two cars near the entrance of the gangway. He also observed a taxicab proceeding south on Greenwood Street. Nelson stated that he saw the cab swerve toward the west side of the street, away from the defendant and Blood, after the first shot was fired. He then observed the cab crash into another automobile. Nelson stated that he saw Tyrone Robinson run into the hallway of a nearby building after the shots were fired. Nelson further testified that he does not remember whether he saw the defendant with a gun on the evening in question.

The final witness to testify was Larry Jones. He stated that, on December 30, 1970, he was with Ulysses Murphy, Joe Thomas, and the defendant. Jones testified that he and his companions went to the building in which Jones and the defendant lived, that Murphy and the defendant entered the building, and that the defendant had a shotgun when he and Murphy left the building. Jones further testified that he and his companions then walked through a gangway to the 6400 block of Greenwood Street. After the four men stood at the mouth of the gangway for 10 or 15 minutes, Jones saw Tyrone Robinson and Nathaniel Nelson walk past. Jones testified that he heard one of his companions say, "Let's get this cab," that he then observed Murphy walk into the street and begin waving and that he saw the defendant walk from the mouth of the gangway to the street curb. Jones further testified that he then saw the defendant fire the shotgun. After Jones heard the first shotgun blast, he and Thomas ran from the area.

Jones also testified on direct examination that he had been charged with murder and attempt robbery for his participation in the crime and that he had been tried, convicted, and sentenced to a penitentiary term of 15 to 30 years. After serving a little more than two years of his

sentence, Jones reached an agreement with the State's Attorney's office with respect to the case against the defendant. Jones stated that in return for his testimony, the State's Attorney's office promised to seek executive clemency for Jones, to have his sentence reduced to a term of three years to three years and a day, and to recommend to the Pardon and Parole Board that Jones be released immediately.

On cross-examination, Jones testified that the shooting did not occur until about 5 or 10 minutes after Robinson and Nelson had walked past the gangway entrance. The witness also stated that he never saw a taxicab during the incident. He conceded that he had testified at his trial that Robinson and Nelson did not walk past the gangway prior to the shooting, but were standing next to the defendant at the time of the shooting. Jones also admitted stating at his trial that he did in fact see a taxicab at the time of the incident. He further admitted testifying at his trial that he had told his companions prior to the shooting that he did not want to participate in the crime. Jones stated on cross-examination that he was not telling the truth at his trial when he made each of the above statements. Jones also admitted giving a statement to the State's Attorney's office prior to trial. In that statement, Jones said that he did see a cab on the evening in question, and that there was a female passenger in the cab. He stated on cross-examination that the above statement was false.

When questioned by defense counsel about the promises made to him by the State's Attorney's office in return for his testimony, Jones stated that the State initially offered merely to write a letter of recommendation to the Pardon and Parole Board. The witness testified that he rejected that offer and agreed to testify against the defendant only after a better offer was made by the State. Jones then stated that he was testifying because he wanted to get out of prison and answered affirmatively when

asked whether he wanted to get out any way he could. On redirect examination, however, the witness said that the State had asked him to tell the truth, that his agreement with the State was conditioned upon his telling the truth, and that he had in fact told the truth at the defendant's trial.

After reviewing the above evidence, the appellate court held that the defendant's conviction must be reversed because he was not proved guilty beyond a reasonable doubt. We agree.

The State relied primarily upon the testimony of Tyrone Robinson. We feel that Robinson's testimony was so thoroughly impeached that, absent very substantial corroboration, it could not support a finding of guilt. The State attaches significance to the fact that 2½ years had passed between the alleged murder and the defendant's trial, that Robinson testified a total of six times in various proceedings concerning the incident of December 30, 1970, and that Robinson was only 15 years old at the time of the offense. In light of these facts, the State maintains that "some clouding of detail" in Robinson's testimony is understandable. A review of Robinson's testimony, however, suggests much more than a mere clouding in detail. We agree with the appellate court's determination that a review of Robinson's testimony suggests fabrication and not merely a loss of memory. The State relies upon the fact that Robinson remained consistent in his testimony that the defendant is the individual who fired the gun. Robinson made inconsistent statements, however, with respect to virtually every other important segment of his testimony. These inconsistencies were so numerous and so blatant that it is simply unreasonable to attribute them solely to a loss of memory.

Robinson agreed to make a statement only after the police informed him that he would be charged with the murder of the cab driver. Robinson was an interested person, therefore, who did have a motive to implicate the

defendant in the murder. Considering this fact, together with the inconsistent testimony given by Robinson, we find that Robinson's testimony was entitled to little weight.

The State relied primarily upon the testimony of Larry Jones to corroborate Robinson. Jones' credibility was severely limited, however, by the revelation that he had agreed to testify only after being promised by the State that his immediate release from prison would be arranged. Jones, who had served a little over 2 years of a 15- to 30-year prison sentence, had much to gain by testifying for the State. While that fact alone did not necessarily destroy Jones' credibility, we have held that when it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth. (*People v. Hermens,* 5 Ill. 2d 277.) Jones' testimony clearly did not carry with it such a conviction. Jones admitted that he had lied at his own trial in an attempt to gain his freedom. He candidly admitted that he was testifying against the defendant in another attempt to gain his freedom. Additionally, Jones' testimony was severely impeached by the fact that he admitted making several material statements under oath on prior occasions which were patently inconsistent with his testimony at trial.

It is also worthy of note that Jones' testimony contradicted as well as corroborated the testimony of Robinson. Jones stated that the shooting incident did not occur until about 5 or 10 minutes after Robinson and Nelson had walked past the gangway on Greenwood Street. That is a substantial contradiction of Robinson's testimony that the shooting took place only seconds after he, Robinson, had walked past the gangway.

The testimony of Nathaniel Nelson provides very limited corroboration to support the testimony of Robinson and Jones. Nelson's testimony does place the defendant at the scene of the crime, but Nelson did not state that

he witnessed the actual shooting or that he saw the defendant in possession of a gun. We find that Nelson's testimony does not provide sufficient corroboration to sustain a finding of guilt.

This court has consistently held that a judgment of conviction will not be reversed unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. (*People v. Williams,* 40 Ill. 2d 522.) It is equally well settled, however, that, although the findings of the trier of fact including an appraisal of the credibility of witnesses are entitled to great weight, a conviction must be reversed where the evidence is so unsatisfactory as to raise a reasonable doubt of the defendant's guilt. (*People v. Reese,* 34 Ill. 2d 77.) For the reasons stated, we conclude that the testimony of the State's two eyewitnesses was entitled to little weight and that the defendant was not proved guilty beyond a reasonable doubt. The judgment of the appellate court is affirmed.

*Judgment affirmed.*