THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD BARNETT, Defendant-Appellant.

First District (1st Division)   No. 1—89—2898

Opinion filed March 3, 1992.

Joseph R. Lopez, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Howard Weisman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

An indictment returned in the circuit court of Cook County charged Donald Barnett (hereinafter defendant) and Tim Taylor with the murder of Allen Nuccio. Defendant was granted a severance from Taylor, and thereafter in a jury trial defendant was found

guilty and sentenced to a prison term of 70 years.[1] On appeal defendant contends that: (1) he was not convicted of murder beyond a reasonable doubt; (2) the trial court erred in allowing the testimony of Christine Robbins regarding an incriminating statement made by a coparticipant that implicated defendant; (3) prejudicial comments made by the prosecutor in closing argument denied him a fair trial; and (4) defendant was not proved guilty beyond a reasonable doubt on an accountability theory. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. On Saturday, November 29, 1986, at approximately 9 a.m., the police discovered the body of Allen Nuccio, slumped over, inside the back of a tow truck parked in a vacant lot at 4230 South Emerald Avenue, Chicago. Police observed numerous gunshot wounds in the body, but found no fingerprints and only minute traces of blood in the back of the truck. At the time of his murder, Nuccio was separated from his wife, Joanne, and lived with Edward Howard in a third-floor apartment above the Fifth Wheel tavern, at 4439 South Halsted Street, Chicago. Defendant owned both the Fifth Wheel and the upstairs apartments. The Fifth Wheel building was across the alley from the vacant lot where police found Nuccio's body.

TRIAL

At trial, Joanne Nuccio testified that she had been married to Nuccio for seven years and that he was a mechanic and tow truck driver. Nuccio had his own business called "T & J Towing," and had a 1970 black Chevy tow truck. Nuccio left the marital home during the second week of November 1986.

Christine Robbins testified on behalf of the State that at the time of the murder she was 22 years old and had known defendant all of her life. Christine frequented the Fifth Wheel, and during November 1986 she went to the Fifth Wheel three or four times a week. The tavern had both a front and back entrance, and there was a separate entrance to the upstairs apartments. Christine frequently used the back entrance to the tavern. Christine knew Tim Taylor and Edward Howard, both hired by defendant, as janitors who ran odd jobs and helped tend bar at the Fifth Wheel.

---

[1] In a separate trial, coparticipant Edward Howard was found guilty of the murder of Nuccio, and this court affirmed his conviction in *People v. Howard* (1991), 209 Ill. App. 3d 159, 568 N.E.2d 56.

On the morning of Thursday, November 27, 1986, Thanksgiving Day, Christine went to the Fifth Wheel with her children to get pop and chips. At that time, she saw defendant, Howard and Nuccio, whom she knew only as "T.J." She heard defendant ask Howard to get bread for Thanksgiving dinner. Christine took her kids to a park adjacent to the tavern and later returned to the tavern through the back entrance. At that time, she saw Howard and Nuccio pull up in a tow truck, and Howard walked inside while Nuccio unloaded the truck. Christine heard Howard say to defendant, "I think that boy's a cop." She left the Fifth Wheel after that.

Later that evening, Christine returned to the Fifth Wheel for Thanksgiving dinner. She stayed until the tavern closed and afterward attended a party upstairs in Howard's apartment. At the party, defendant and Tim Taylor went into the front room and she went into the kitchen. Nuccio was in the kitchen and asked if someone would get him some cocaine. Howard told Tim Taylor to get the cocaine, Nuccio handed Taylor money and Taylor left. Taylor returned later with a bag of cocaine and everyone at the party used the cocaine.

After a few minutes, Nuccio told Howard to hide the cocaine in case the cops came, and Nuccio handed the cocaine to Howard. Howard unscrewed the drain pipe in the sink and pretended to put the cocaine in the drain, but in fact he put it in his pocket. A few minutes later, Nuccio said "Let's do another line." Howard walked over to the sink, turned on the faucet, and said "Oh my God, I just flushed it down the sink." The party then broke up. Before Christine left, she heard defendant say to Terry Taylor, Tim Taylor's brother, that he thought Nuccio was a cop but that he did not care because Nuccio was doing dope with them.

Christine had rented an apartment on the second floor from defendant at one time, and returned to the apartment to sleep that night. At 9 a.m. Friday, she awakened and heard Howard and Nuccio arguing upstairs. Nuccio accused Howard of selling his dope and of taking his cocaine. Christine left the apartment and went home.

At 2 a.m. Saturday, November 29, Christine returned to the Fifth Wheel through the back entrance. She ordered a drink at the bar and sat down next to the office in the rear of the tavern. Nuccio entered and ordered a six-pack to go. Nuccio talked to Howard, Tim Taylor and defendant for a little while and then exited via the back door. A few minutes later, defendant, Howard and Taylor turned around and walked into the office. The three men came out of the office talking, but she could not hear their conversation. Af-

ter a few minutes, the three men re-entered the office. Taylor exited the office first. Then, on his way out of the office, defendant passed Howard a small, white and silver pearl-handled .22 caliber handgun. Christine recognized the gun as the same one defendant had asked her to hide in her apartment during a police raid at the time she lived above the Fifth Wheel. At that time, defendant had told her the gun was a "twenty-two."

Howard exited through the back door. Defendant then announced that the tavern was closed and told everyone to leave. Defendant told Taylor to lock the back door, which was unusual because everyone came and went through both doors. Christine noticed at that point that someone had changed the clock to read 4 because she had, just prior to defendant's announcement, noted that it was 3:30. The Fifth Wheel usually closed at 4 a.m.

Christine then went for a ride with some friends, drank beer, and used cocaine. She returned to sleep at her old apartment at the Fifth Wheel. She was dropped off at the park at the side of the Fifth Wheel and entered through the back entrance to the apartments. As she entered the hallway she heard noises sounding like "M80" firecrackers blasting up through the building. As she walked up the stairs she heard people arguing and saw Tim Taylor and his girl friend, Nancy McNulty, running down the front stairs of the building.

Christine awoke later Saturday morning and went home to find that her sister Alice, known as "Gidget," was upset about something. Christine asked Gidget what was wrong, but Gidget said not to bother her and said she did not get any sleep. On that evening, Christine returned to the Fifth Wheel to find it closed.

Christine testified that on the morning of December 3 she returned to the Fifth Wheel through the back door. Defendant, Janet Knight and Larry Crossway were present in the tavern. Christine heard defendant telling Crossway to bond Howard out of jail. Christine then left the tavern.

Later that same day, Christine returned to the Fifth Wheel and saw defendant, Knight and Howard. Howard was sitting at the bar drinking shots of whiskey. Christine heard Howard saying, "I did it. You did it. We all did it. We killed T.J." At that point, defendant walked over to Howard, put his arm around Howard's neck and said, "shut up m----- f---er." Christine then left the tavern.

Christine did not tell the police what she had seen in November and December of 1986 until April of 1988. The day after Christine talked to the police, defendant approached her on the street,

grabbed her and said that she and her sister were "tricks" and "snitches." Two days later, defendant again approached her and said he heard that she and her sister were both talking to the cops. Thereafter, she and her family were relocated to Streator, Illinois, because she was afraid of defendant.

Following Christine's testimony, defense counsel moved for a mistrial on the ground that Christine's testimony regarding the events of December 3, 1986, was inadmissible hearsay. The trial court denied defendant's motion.

Alice Robbins Parlich (hereinafter Gidget) testified for the State that in November 1986 she lived with her sister Christine, her brother Jack Robbins, and Christine's four children. On Friday, November 28, Gidget was supposed to baby-sit for Christine's children at 8:30 or 9 p.m., but did not arrive home until 1:30 a.m. on Saturday morning, November 29. At approximately 2:20, after Christine left and the children were sleeping, Gidget went out to Graham Park at 45th Street and Union Avenue, where she met Sean Dwyer. Dwyer asked her if she wanted to smoke a joint, and they walked to the Fifth Wheel to buy a joint.

Gidget and Dwyer went up to the third floor of the apartments at the Fifth Wheel via the back entrance. They knocked on the door of Howard's apartment, Howard opened the door, and they entered the front room. Defendant, Howard and Nuccio were in the front room. Defendant was talking to Howard, and Nuccio was sitting in a chair. Gidget and Dwyer went back to the kitchen. Howard entered the kitchen and handed a lit joint to Dwyer. Dwyer passed the joint to Gidget.

Gidget then heard a "big boom" from the front room. She saw Tim Taylor come through the door toward Nuccio and shoot at him approximately three or four times. During the shooting, Howard was standing near Taylor in the archway to the kitchen and defendant was standing on the other side of the chair upon which Nuccio sat. Gidget grabbed Dwyer's arm and pulled him down to the floor because she was scared. Neither defendant nor Howard tried to help Nuccio after the shooting, nor did defendant look surprised after Taylor finished shooting Nuccio. After the shooting stopped, defendant said to Nuccio, "you cock, you snitch."

Gidget then pulled Dwyer up and they ran toward the front door. She noticed Nuccio slouched down in the chair. Howard jumped in front of the door and said, "What you just saw you didn't see, and you ain't going nowhere." Howard pushed Gidget and Dwyer away from the doorway, and defendant motioned for

Howard to leave the room. Defendant then threatened Gidget and Dwyer, saying "What you just saw didn't happen," and that if either of them said anything, "I will kill you and your families, and if I don't, someone will." Defendant grabbed Dwyer by the back of the neck and walked him toward the front door telling him to leave and never come back. Defendant opened the door and let Dwyer go, then threatened Gidget again and let her go.

Gidget ran down the front stairs out of the building and around the building to an alley toward her sister's house. She ran through a gangway and heard sounds of fighting in the alley. She then saw Howard and another man, whom she could not identify, beating Nuccio on the ground. Nuccio was moaning. The other man picked up Nuccio, kicked him and said, "T.J., T.J." She heard the man say "It's useless" and then saw Howard pull out a silver gun and shoot Nuccio about five times. When Howard picked up the body, she ran. The next day, Gidget and Dwyer decided not to tell anyone what they saw because they were afraid of defendant's threats.

In May 1987, Gidget told police that she saw Howard shooting somebody in the alley, but did not tell them about anything she saw in the apartment because she was scared. In June 1988, Gidget told the police everything she witnessed in Howard's apartment. On cross-examination, Gidget testified that a year after the murder, she learned through a newspaper that there was a $5,000 reward for anyone with knowledge of Nuccio's murder.

Sean Dwyer testified on behalf of the State that he had known defendant for several years and that defendant had a business selling drugs. Dwyer sold cocaine for defendant and would go to the Fifth Wheel four times a week to pick up drugs from defendant. Dwyer first saw Nuccio in mid-November 1986 at the Fifth Wheel. Approximately 10 days before the murder, defendant asked Dwyer to deliver cocaine to 120th Street and Harlem Avenue and Dwyer asked for a ride because it was far away. Defendant said Dwyer could not get a ride from him, Tim Taylor or Howard. Defendant told Dwyer that they had to stay and "watch T.J." because defendant thought Nuccio was a cop. A few days before the murder, at 2 a.m., Dwyer had a conversation with Taylor while walking through Graham School Park, just south of the Fifth Wheel. Taylor told Dwyer to "watch out for T.J." and not to talk to him because he was a cop.

On Friday evening, November 28, Dwyer went to meet his cousin, Johnny Barrett, at 45th and Union Avenue, but Barrett did not show up. After two hours, Dwyer left and went to the Fifth

Wheel. At the Fifth Wheel, Dwyer talked to defendant, then went upstairs with defendant, Taylor and Howard to Howard's apartment. Nuccio was in the apartment sitting in a chair, and appeared to be drunk and high on drugs. They all drank for the next few hours. Then defendant asked Dwyer to go downstairs and look for Jack Robbins because Jack owed defendant money.

Dwyer did not find Jack at the tavern, so he went back up to Howard's apartment and saw Gidget Robbins. Dwyer followed Gidget into the apartment. Nuccio, defendant, Howard and Taylor were still in the apartment. Dwyer and Gidget went into the kitchen and started to do cocaine. Then Taylor left. Taylor continued to come and go from the apartment. During that time, Nuccio was sitting in a chair, defendant was sitting to Nuccio's left and Howard was seated next to defendant.

Taylor returned again and started shooting at Nuccio. Dwyer jumped down into the corner on the floor with Gidget. Dwyer was not sure how many shots he heard, but thought he heard six or eight shots. When the shooting stopped, Dwyer looked into the doorway and saw Nuccio slumped down, covered with blood, choking and gagging. There was blood on the floor and the wall. Neither defendant nor Howard attempted to help Nuccio.

After the shooting, Taylor left and defendant and Howard stood in the doorway. Dwyer asked "what the hell's going on" and Howard told him to calm down. Defendant was telling Nuccio "shut the hell up, you cop." Dwyer said he wanted to leave, and defendant told him to stay for a while. Dwyer and Gidget walked farther back into the corner of the kitchen. Defendant gave Dwyer some cocaine and told him not to come around anymore. Dwyer ran to his father's house and did not tell anyone what he had seen that night.

Dwyer stated that he served a sentence in the St. Charles penitentiary for burglary from October 1985 through August 1986, and again for burglary and battery from January 16, 1987, until November 13, 1987. He lived with his mother in Chicago from November 1987 until March 1988, when he was arrested in Missouri. At the time of the trial, Dwyer was serving two concurrent five-year sentences for unlawful use of a weapon and receipt of stolen goods.

Stacey Conrad testified that in November 1986 she worked the 6 a.m. to 2 p.m. shift as a waitress and cashier in the Stockyards Truck Stop at 4516 South Halsted, Chicago. Conrad stated that she had known defendant all of her life, and knew that he owned an older, white Cadillac. On Saturday, November 29, at 5:15 a.m., as

she was walking down Emerald Avenue to work, she heard a shot from the direction of a vacant lot toward 43rd Place. At the intersection of 43rd Place and Emerald Avenue, she heard screeching tires and saw defendant in his white Cadillac, followed by a black car driven by Howard, heading east on 43rd Place. The two cars, going approximately 50 to 60 miles per hour, turned into the alley across Union Avenue.

Doctor Michael Chambliss, a Cook County medical examiner, testified that he performed an autopsy on Nuccio's body on November 30, 1986. Nuccio suffered blunt trauma and gunshot wounds from the neck and head area to the waist area, and had injuries and abrasions on his body consistent with a person being dragged. Doctor Chambliss found that Nuccio suffered a total of 13 gunshot wounds to the body, and Chambliss recovered seven bullets from the body. Chambliss determined that Nuccio died of multiple gunshot wounds.

Chicago police department firearms examiner Ernest Warner testified that on December 1 he examined seven .22 caliber bullets recovered from Nuccio's body. From his examination of the bullets, he could not determine whether they were fired by a handgun, such as a Jennings, or a semi-automatic long gun, such as a Marlin rifle. Each of these weapons has similar characteristics in terms of analysis of fired bullets, and Warner determined that the murder weapon could have been either of these types of gun.

On cross-examination, Warner stated that a Jennings semi-automatic could either be plated, a shiny color, nickel-plated, chrome-plated or dark blue, but that the handles are readily interchangeable. He stated that it is a small gun which could be carried in a coat pocket. Warner stated that Marlin rifles are usually semi-automatic but are also made in "bolt action." In his work, Warner sees four to five as many Marlin rifles as Jennings handguns. On redirect, Warner stated that he has seen many Jennings semi-automatic pistols from the Chicago police department crime lab.

Chicago police detective Robert Lane testified on behalf of the State that on Saturday, November 29, he went to the Fifth Wheel tavern at approximately 8 p.m. to investigate the Nuccio murder and found the tavern closed. He had heard that Nuccio had been staying in an apartment above the Fifth Wheel.

On December 1, at approximately 8 p.m., Lane returned to the Fifth Wheel with his partner, Roy Kwilos, to obtain more background information on Nuccio. They went to Howard's apartment on the third floor and Howard admitted them. Lane and Kwilos en-

tered the kitchen and sat down at the kitchen table. It appeared that the walls, woodwork, baseboard and circumference of the floor area had been freshly painted. Lane could smell the fresh paint in the room.

Chicago police officer Richard Hanley testified that on June 8, 1988, he arrested defendant for the murder of Nuccio. Upon arrest defendant stated: "You cannot arrest me for that. You can only arrest the one who done the shooting." The State rested, and following closing arguments, the jury returned with a verdict of guilty. Judgment was entered on the verdict, and following a sentencing hearing, the trial court sentenced defendant to a prison term of 70 years. Defendant's timely appeal followed.

OPINION

Initially, defendant argues that he was not convicted of murder beyond a reasonable doubt. Defendant contends that the State failed to produce any physical evidence linking defendant to the murder and that the testimony of Gidget Robbins and Sean Dwyer was contradictory and self-impeaching. The State responds that viewed in a light most favorable to the prosecution, the record shows that the jury properly assessed the credibility of the witnesses, the weight of their testimony and the inferences drawn therefrom.

It is well established that a judgment of conviction will not be reversed on review unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. (*People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 525.) Upon review, the findings of the trier of fact, including the credibility of witnesses, are entitled to great weight. However, the reviewing court will reverse the conviction if the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. *Williams*, 65 Ill. 2d at 268.

Defendant first contends that the State lacked physical evidence linking him to Nuccio's murder, specifically that the murder weapon was not introduced into evidence, no fingerprints were found on Nuccio's truck, only minute traces of blood were found in the truck, and no blood was found outside the truck or anywhere on the ground surrounding the truck. This argument was raised by defendant in *People v. Howard* (1991), 209 Ill. App. 3d 159, 171, 568 N.E.2d 56, and as in that case, both defendant and the State rely on the balancing of the facts to support their positions.

■■ Regarding the murder weapon, defendant contends that the testimony of the State's firearms examiner, Ernest Warner, conflicted with the State's theory that a small .22 caliber handgun had been used as the murder weapon. In making this argument, defendant mischaracterizes Warner's testimony. Warner testified that the seven bullets recovered from Nuccio's body were .22 caliber bullets fired from either a Jennings handgun or a Marlin rifle. Warner stated that each of these weapons has similar characteristics regarding analysis of fired bullets and that while he sees four to five times as many Marlin rifles as Jennings handguns, the murder weapon could have been either type of gun. Faced with the same contentions in *Howard,* this court concluded that Warner's similar testimony did not contradict the State's position that the bullets had been fired from a .22 caliber handgun.

■ As for the lack of fingerprints and bloodstains in and around the truck, the State responds, as in *Howard,* that absence of fingerprints merely shows that defendant was careful not to leave fingerprints on the truck. In *Howard,* this court found it reasonable for the jury to have believed that the crime scene had been cleaned to remove all traces of blood and fingerprints. *Howard,* 209 Ill. App. 3d at 172.

■ Next, defendant contends that the eyewitness testimony of Gidget Robbins and Sean Dwyer was inconsistent, self-impeaching, and unbelievable. The State admits that while inconsistencies exist regarding minor details, the testimony of the two witnesses is consistent regarding the actual shooting.

Any conflicts or inconsistencies in the testimony of witnesses go to questions of the weight of the evidence and the credibility of the witnesses. These questions, as well as any inferences to be drawn from the evidence, are within the province of the jury and, on review, the court will not substitute its judgment for that of the jury unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

Defendant alleges the following inconsistencies between Gidget's testimony and Dwyer's testimony establish a reasonable doubt as to defendant's guilt: (1) Gidget stated that she met Dwyer in a park and walked to Howard's apartment; Dwyer stated he met Gidget in the hallway going into Howard's apartment; and (2) Gidget testified she heard Taylor fire three or four gunshots; Dwyer stated he heard maybe six or eight gunshots.

In *Howard*, defendant contended that similar testimony by Gidget and Dwyer was inconsistent. There, this court found the testimony regarding the witnesses' meeting to be irrelevant as to the actual shooting and attributed the variance in testimony to the 1½-year interval between the occurrence and the trial. (209 Ill. App. 3d at 173.) Based on the similarity of the testimony in the record in the present case to the testimony of the same witnesses in *Howard*, the inconsistencies here are irrelevant.

As to the inconsistencies in the testimony regarding the number of shots heard, in examining similar testimony, this court found that Gidget's answer was not unequivocal, that Dwyer's answer was an approximation, and that considering the circumstances, the jury could have reasonably concluded that the witnesses may not have kept an accurate count of the shots fired. (*Howard*, 209 Ill. App. 3d at 173.) We find the same to be true in the present case. As the State indicates, the record, in fact, discloses many significant consistencies between Gidget's and Dwyer's testimony regarding the actual shooting in Howard's apartment: both witnesses entered Howard's apartment via the back stairway; upon entering the apartment, each witness noticed that Nuccio was intoxicated and slumped in a chair; both witnesses went into the kitchen; both witnesses saw Taylor burst into the apartment and commence shooting Nuccio; both Gidget and Dwyer were together in the kitchen when the shooting began; they both fell to the floor; defendant restrained both of them from leaving the apartment; and defendant allowed Dwyer to leave first. As in *Howard*, neither the lack of physical evidence nor the minor inconsistencies between the testimony of Gidget and Dwyer render the evidence so unreasonable, improbable or unsatisfactory as to justify this court's reversal of the jury's determination of guilt beyond a reasonable doubt.

In addition, defendant contends that the record disclosed discrepancies regarding the time of the shooting. Defendant contends that Gidget stated she heard gunshots at "approximately 3 a.m."; however, no such testimony by Gidget appears in the record at all. Defendant further contends that Dwyer stated he heard gunshots at 4 a.m. and that Christine Robbins heard gunshot-like noises at "approximately 5 a.m." In fact, the testimony of neither Dwyer nor Christine indicates any time at which they heard gunshots. Regarding these alleged discrepancies, there is no inconsistency because the record discloses that none of the witnesses gave explicit testimony as to the precise time of the shooting.

■ Defendant further attempts to discredit Dwyer's testimony on the basis that Dwyer had a motive to cooperate with the prosecution to avoid a conviction for battery. However, the record indicates that at the time Dwyer testified, he was serving two concurrent five-year sentences for unlawful use of a weapon and receipt of stolen goods and there was no battery charge pending against him.

■ Defendant also contends that Gidget's testimony is inherently unreliable and incredible on the grounds that she never reported the shooting to the police, did not talk to police until May 1987, six months after the shooting, that she made statements to the police which she later admitted were false, and that she learned of a reward before she talked to the police in June 1988. The State responds that Gidget's testimony corroborates Dwyer's testimony and that Gidget initially lied to the police because she was afraid of defendant.

The record shows that Gidget's trial testimony regarding the actual shooting corroborates Dwyer's testimony regarding the same. Gidget further admitted that she initially withheld her account of the shooting in Howard's apartment because she was afraid for her life and the lives of her family members. In analyzing similar contentions in *Howard*, this court stated:

> "Defendant also refers to the fact that Gidget did not talk to the police about the shooting until they contacted her in May 1987 and threatened to charge her with the murder. The question of whether Gidget's testimony is improbable or incredible because of this time lapse is one of credibility which goes to the weight of the evidence. This determination is to be made by the trier of fact. Considering the evidence of threats made by Barnett to Gidget and to her family, the jury reasonably could have believed that Gidget was too frightened to contact the police, and too frightened to implicate Barnett." (*Howard*, 209 Ill. App. 3d at 175.)

Thus, no reasonable doubt exists regarding defendant's guilt which would warrant a reversal of his conviction.

Next, defendant argues that the trial court committed reversible error when it admitted hearsay statements into evidence under the co-conspirator exception to the hearsay rule. Specifically, defendant refers to testimony made by Christine Robbins as to the statements made by Howard and defendant at the Fifth Wheel on December 3, 1986. Defendant claims that such evidence does not fall within the co-conspirator exception to the hearsay rule, because the State failed to establish a *prima facie* case of conspiracy upon a

preponderance of nonhearsay evidence. Defendant further contends that even if such a conspiracy did exist, defendant was unaware of the conspiracy and did not act in furtherance of the conspiracy.

Under the co-conspirator's exception to the hearsay rule, the declarations of a co-conspirator made in furtherance of the conspiracy are admissible against a defendant even though they were made outside of defendant's presence. (*People v. Miller* (1984), 128 Ill. App. 3d 574, 470 N.E.2d 1222.) To rely on this exception, the State need only establish the existence of a *prima facie* case of conspiracy by a preponderance of the nonhearsay evidence and must show that two or more persons were engaged in a common plan to accomplish a criminal goal or to reach a common end by criminal means. (*People v. Brock* (1989), 184 Ill. App. 3d 595, 540 N.E.2d 554.) The existence of the agreement need not be proved by direct evidence, but may be inferred from surrounding facts and circumstances, including acts and declarations of the accused. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 945, 455 N.E.2d 733.) It is within the discretion of the trial court to admit into evidence hearsay statements or acts of a co-conspirator before sufficient proof of the conspiracy by independent evidence has been given. *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883.

In the present case, defendant contends that Christine's testimony regarding what she saw and heard at the Fifth Wheel on December 3 is inadmissible hearsay evidence. Christine testified that she heard Howard say "I did it. You did it. We all did it. We killed T.J.," and in response, defendant walked over to Howard, put his arm around Howard's neck and said, "shut up m----- f---er."

▆ The record establishes direct evidence of conspiracy through witness testimony of events occurring prior to December 3. Christine testified that on November 29, at the Fifth Wheel, defendant handed Howard a small, silver pearl-handled gun and that she recognized it as defendant's .22 caliber handgun. Gidget testified that she saw Howard holding a small, silver gun in the alley when he shot Nuccio. Police testimony confirmed that the bullets recovered from Nuccio's body were shot from a .22 caliber pistol. Stacey Conrad testified that she saw defendant speed past her in his white Cadillac at 5:15 a.m. on November 29.

Moreover, the defendant in *Howard* objected to similar testimony presented by Christine in that case. There, this court found that the statements made by Howard were in furtherance of a conspiracy and that the trial court properly admitted those statements under the co-conspirator's exception to the hearsay rule. (*Howard*,

209 Ill. App. 3d at 186.) Accordingly, the statements made by Christine were properly admitted in the present case.

Next, defendant argues that he was substantially prejudiced and denied his rights to a fair trial by the State's inflammatory comments during closing argument.

Defendant contends that the prosecutor's comments regarding the events Gidget witnessed in the alley were prejudicial. When commenting that Gidget had seen two men beating Nuccio in the alley, and had positively identified one of the men as Howard, the prosecutor argued:

> "Who was the one that was slapping and kicking Allen Nuccio, Ladies and Gentlemen? We know that Tim Taylor's on the other side of the building. *** There's [*sic*] only three guys involved. It was Don Barnett, Edward Howard and Tim Taylor. It had to have been him. *** So he was the one with Eddie Howard who took that man out in the back and he was that second person with Eddie Howard who delivered the coup de grace to Allen Nuccio in the back."

A prosecutor is given great latitude during closing argument, and the propriety of his comments is within the trial court's discretion. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 484 N.E.2d 329.) The prosecution may base the closing argument on the evidence presented or reasonable inferences therefrom, denounce the activities of defendant and urge that justice be administered. (*Morrison*, 137 Ill. App. 3d at 184.) In order for a prosecutor's remarks to constitute grounds for reversal, they must be of "substantial magnitude" when viewed in the context of the entire record to have prejudiced defendant's rights to a fair trial. (*People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288.) Any alleged prejudice to defendant is cured by the trial court's instruction to the jury that closing arguments are not evidence and that they should disregard any comments made during closing argument which are not based on the evidence. (*Scott*, 194 Ill. App. 3d at 645.) In the present case, the trial court so instructed the jury.

■ The State argues that the prosecutor's comments were based upon the testimony of Gidget and Christine Robbins and the reasonable inferences therefrom. Gidget testified that she saw Howard and another man beating and kicking Nuccio in the alley behind the Fifth Wheel. Christine testified that she saw Taylor and his girl friend flee via the front door of the Fifth Wheel. The State argues that from this evidence, the jury could reasonably infer that defendant was the other man with Howard in the alley. However, as

there is nothing in the record that supports the proposition that the "other man" was, in fact, the defendant, the prosecutor's comments were in error.

While in error, we do not believe that the prosecutor's comments deprived defendant of a fair trial. Where it appears that improper comments do not constitute a material factor in defendant's conviction, without which the jury might have reached a different result, the verdict will not be disturbed. (*People v. Lyles* (1985), 106 Ill. 2d 373, 391, 478 N.E.2d 291.) Here, the evidence of guilt was overwhelming so that no rational jury could have done anything but convict defendant. Where overwhelming evidence of defendant's guilt exists, a prosecutor's improper comments during closing argument are harmless error. (*People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089.) Under the circumstances, we are convinced that the prosecutor's remarks had no material effect on defendant's conviction and fail to provide grounds for reversal, either individually or cumulatively.

■ Finally, defendant contends that the testimony of Tucker Bentley, a witness who testified at Edward Howard's trial, but not at defendant's own trial, contradicts comments made in closing argument by the prosecutor in the present case. Defendant argues that in *Howard*, Bentley admitted carrying Nuccio's body down the back stairs of the Fifth Wheel. (*Howard*, 209 Ill. App. 3d at 169-70.) We find no merit to defendant's argument. Bentley did not testify in the present case, and his testimony was not before the jury as evidence.

Defendant next contends that the State failed to show, beyond a reasonable doubt, that defendant was accountable for Nuccio's murder.

In Illinois, a person is accountable for an offense where the jury can reasonably infer from the evidence that defendant solicited, aided, abetted, agreed or attempted to aid another in the planning or commission of an offense, and that the defendant participated before or during the commission of the offense with the specific intent to commit the crime. (*People v. Thomas* (1989), 186 Ill. App. 3d 782, 542 N.E.2d 881, 887.) The intent to promote or facilitate a crime can be shown by evidence that the defendant and the principals shared a community of unlawful purpose, evidenced by prior deliberation to commit the offense or by the spontaneous and combined participation of a group in the participation of the offense. *People v. Gil* (1984), 125 Ill. App. 3d 892, 466 N.E.2d 1205.

■■■ In the present case, the trial court found significant evidence in the record indicating defendant's accountability for Nuccio's murder. The record shows that the murder occurred in defendant's presence, in his own building, and at the hands of his employees, Howard and Taylor. The jury could infer the unlawful purpose between defendant, Howard and Taylor by the actions and words of defendant. The record indicates that defendant thought Nuccio was a "cop" and wanted Taylor to watch him. Defendant provided Howard with a gun, defendant was not surprised when Taylor burst through Howard's apartment and shot Nuccio, defendant failed to assist Nuccio, threatened both Gidget and Sean Dwyer, and wanted to keep Howard from discussing the details of the murder. Finally, upon arrest, defendant stated "You cannot arrest me for that. You can only arrest the one who done the shooting." Based on our review of the record, sufficient evidence exists for the jury to have found defendant guilty beyond a reasonable doubt on an accountability theory.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.