THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RINANDO TUCKER, Defendant-Appellant.

Fifth District   No. 5—97—1073

Opinion filed November 3, 2000.

Daniel M. Kirwan and Larry Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

Rinando Tucker (defendant) was charged with two counts of first-degree murder (720 ILCS 5/9—1(a)(1) (West 1996)) in connection with the shooting deaths of Martin (Marty) and Judith (Judy) Dotson. After a jury trial, defendant was found guilty on both counts. Defendant was sentenced to natural life in prison. On appeal, defendant argues: (1) he was denied the effective assistance of counsel because his trial attorney (a) failed to object to the State's presentation of two firearms that were not related to the instant case and (b) failed to present favorable character evidence because he believed that the State could rebut that evidence with an investigation pending against defendant in an unrelated matter; and (2) he was denied a fair trial due to improper actions by the prosecutor, including (a) presenting two guns to the jury that were completely unrelated to the case at bar, (b) presenting evidence of papers bearing Marty Dotson's name that were unaccountably found in a third party's trash can, and (c) arguing that defendant's guilt was established by comparing defendant's actions to those of the third party who found the irrelevant papers in the trash. We affirm.

## FACTS

The victims, Marty and Judy Dotson, husband and wife, lived in Centreville and were murdered in their home late in the evening on April 17, 1997, or early in the morning on April 18, 1997. Defendant, age 20 at the time of the murders, did not deny his presence at the scene, but he denied killing the victims. Defendant asserted that Brandon "Buck" Craighead, age 16, was the shooter. Defendant was tried under an accountability theory. Craighead was tried separately.

The evidence showed that on April 18, 1997, Centreville police sergeant William Miller was working the midnight shift. During his shift, he observed a Chevy Corsica being driven in a strange manner and attempted to investigate; however, the driver of the Corsica would not stop. A chase ensued. Ultimately, the Corsica came to a stop and its occupants fled on foot. Sergeant Miller found a cellular phone near the car. He ran the plates on the car and found that the car was registered to Marty Dotson. Sergeant Miller did not attempt to contact Mr. Dotson at that time.

At 9 a.m. on April 18, 1997, Centreville police officer Gregory Hosp was dispatched to the victims' home to check on their well-being. When Officer Hosp arrived, he found the front door partially open. Upon entering the home, he discovered Marty Dotson's body slumped on a bar stool and Judy Dotson dead on her bed. Each victim died from a single, close-contact gunshot to the head. Crime-scene technicians were then called to the scene. The major case squad, which consists of police officers from various departments called in to work a case for five days following the commission of a major crime, was also utilized.

Patricia Jackson, a crime scene investigator for the Illinois State Police, arrived at approximately 10:43 a.m. She found no evidence of forced entry. Both bedrooms were ransacked. She collected People's exhibit 5c, latent fingerprints from the inside of the front door and from a metal box found on a bedroom floor. The print from the metal box was transferred and labeled as People's exhibit 5b. A fingerprint expert identified the latent print as a fingerprint of defendant's left middle finger. Judy Dotson's daughter, Karin Morales, testified that she had seen the two metal boxes at the victims' home, but she did not know what was stored in those boxes. She also testified that the victims kept several pieces of jewelry in their bedroom. The jewelry was missing after the victims were killed.

Other evidence collected at the scene included, *inter alia*, a shell casing discovered in the living room, People's exhibit 18, and a shell casing discovered in the bedroom, People's exhibit 17. Spent projectiles were later retrieved from the bodies of the victims and introduced at

the trial as People's exhibits 12 and 13. Police videotaped the crime scene. The videotape was shown to the jury.

Detective Coppetelli of the Collinsville police department testified that on April 19, 1997, as part of his duties with the major case squad, he discovered a Howard University jacket in a backyard strewn with trash. During the investigation, Detective Coppetelli also recovered a firearm from Judy Dotson's son, Tim Foster. Detective Coppetelli interviewed Foster, who indicated that he had a firearm at his residence. Foster turned the firearm over to the police. The gun was analyzed and identified by police as a .32-caliber, but it was not connected to the crime in question. The gun was marked as People's exhibit 7 and shown to the jury. Likewise, People's exhibit 8, a superautomatic, .38-caliber Colt pistol, which was not connected to the crime, was shown to the jury. However, after defense counsel objected, the State withdrew its motion to have the guns admitted into evidence. Collinsville police officer Todd Link testified that he retrieved the .38-caliber gun from Michael Gillespie on April 20, 1997. The State failed to tie up Gillespie's connection with the investigation.

Thomas Gamboe, Jr., a forensics, firearm, and toolmark expert, examined People's exhibits 7 and 8, along with People's exhibits 12 and 13, which were, in his opinion, bullets from a .38-caliber or nine millimeter weapon, and People's exhibits 17 and 18, the discharged cartridge cases. Gamboe opined that exhibits 12 and 13 were fired from the same weapon, as were exhibits 17 and 18. Gamboe further opined that exhibits 12 and 13, the spent projectiles, could not have been fired from either People's exhibit 7 or 8.

John Vickers, who lived on 36th Street in East St. Louis, testified that on April 18, 1997, at approximately 3 a.m., he got up to use the bathroom and noticed that someone had piled trash near his trash cans, which he had set out the night before to be picked up the following morning. Mr. Vickers returned to bed, but he stopped his car on the way to work to try to stuff the extra trash into his trash can. Some of the items would not fit, so Mr. Vickers set them in his house to be sorted through later. When he arrived home from work in the evening, he attempted to stuff the extra trash into a trash bag. He then watched the evening news and learned of the victims' murders. He realized that he had seen Mr. Dotson's name on one of the papers in the trash left by his trash cans. Mr. Vickers called his attorney to find out what to do. His attorney advised him to keep what he had and to bring it to the attorney's office, where he met with police and handed over the trash. Items included an ashtray, a car caddy, a glove, and papers. These items were introduced into evidence as People's exhibit 33.

Shondreka Hinkle, age 17, testified that near the date of the murders defendant and Craighead were at her house while she was babysitting her four-year-old nephew. Craighead had a gun and insisted on showing it to her. At one point, Craighead handed the gun to the four-year-old. Hinkle got angry and struck the gun out of her nephew's hand. On that same evening, Craighead told her that he needed some money and was going to kill a woman in Parkside. According to Hinkle, defendant told Craighead to be quiet because Hinkle might tell someone.

Angeletta Jacobs is Craighead's cousin, and she has been acquainted with defendant for several years. She also knew the victims. She recalled that on the evening when the victims were killed, she was with Craighead and defendant at her mother's house. They arrived about 9 p.m., and she cooked them some food. Craighead had a gun, which he showed to defendant. Jacobs testified that Craighead told defendant it was a nine millimeter. Craighead and defendant left a little before 10 p.m. Jacobs received a phone call from defendant at about midnight. A few minutes after her conversation with defendant, Craighead called her. Jacobs recalled that both conversations were normal conversations and that nothing seemed out of the ordinary.

A records officer for Ameritech testified about the billing records from the victims' cellular phone. Two telephone calls were billed to the phone on April 17, 1997. The first was an incoming call at 2:34 p.m.; the second was an outgoing call at 11:29 p.m. Six outgoing calls were billed to the telephone in question on April 18, 1997, at the following times: 12:21 a.m., 12:43 a.m., 1:21 a.m., 1:27 a.m., 4:11 a.m., and 4:28 a.m.

Defendant left the area after the murders and went to stay with relatives in Beloit, Wisconsin, where he was arrested. Sergeant Kurt Reynolds of the Beloit police department testified that after he received a telephone call informing him that there was a warrant for defendant's arrest, he called Joyce Tucker in Beloit and she confirmed that defendant was staying with her. When officers arrived at the Tucker residence, defendant surrendered without incident. After searching the house in Beloit where defendant was staying, police found, hidden beneath carpeting in a bedroom, photocopies of newspaper articles concerning the victims' murders.

On May 7, 1997, defendant was interrogated in Beloit by police officers, including Sergeant Steve Brown of the Centreville police department. Defendant gave a nine-page written statement to police, as well as a videotaped statement. Both the written statement and the videotape were introduced into evidence. The videotape was played to the jury.

Outside the presence of the jury, the State moved for the admission of any exhibits not previously introduced into evidence. Defense counsel objected to the admission of the weapons, citing *People v. Wade*, 51 Ill. App. 3d 721, 366 N.E.2d 528 (1977), on the basis that it is reversible error to admit weapons that are in no way connected to the crime. The prosecutor argued that the guns were admissible to show that a thorough investigation had been conducted by the police. The trial court reserved its ruling. Ultimately, the State withdrew its motion to admit the guns; however, the prosecutor qualified the withdrawal by asserting that if defense counsel attempted to argue that a complete investigation had not been conducted, the State should be able to rebut that argument by showing that the police had conducted a thorough investigation, including the retrieval of two guns.

Defense counsel also stated that as part of his trial strategy he was not going to introduce favorable character evidence on defendant's behalf. Defense counsel explained that if he introduced character evidence, the State could rebut such evidence with details of a pending burglary investigation of defendant. Defendant took the stand in his own defense.

Defendant testified that, prior to the night in question, he socialized with Brandon Craighead on only two or three occasions. He was with Craighead on the night of the murders because Craighead wanted defendant to meet his cousin from Kansas City, who was visiting and who was thinking about giving defendant a job. Defendant could not remember Craighead telling Ms. Hinkle that he was going to kill someone. He did, however, remember the incident involving Hinkle's four-year-old nephew. Defendant denied planning the events of the evening or planning to rob anyone.

Defendant explained that Mr. Dotson had a reputation for helping kids, including defendant. Defendant had been to the victims' home on other occasions, and Mr. Dotson had paid him to do odd jobs. Defendant testified that he and Craighead arrived at the victims' home between 9 p.m. and 11 p.m., after Craighead suggested that they go to the victims' house. Mr. Dotson let them in after defendant identified himself. Mr. Dotson padlocked the door after defendant and Craighead entered. Defendant and Craighead had brandy, cigars, and marijuana. Defendant opened a cigar and put some marijuana inside and smoked it. The three socialized.

Mr. Dotson asked defendant how his mother was doing, and defendant responded that she was fine. Mr. Dotson then asked Craighead how his mother was doing, and Craighead went ballistic, screaming at Mr. Dotson that it was wrong to be asking about his mother. Mr. Dotson and Craighead locked arms, but defendant interceded, and the sit-

uation seemed calmer; however, Craighead suddenly got up, drew a gun from his pants, and shot Mr. Dotson. Defendant told Craighead that he was going to leave, but Craighead turned the gun on defendant and told him that he was not going anywhere and that even if he wanted to leave, he could not because the door was padlocked.

Mrs. Dotson, who was in a back bedroom, then called out and inquired about the loud noise. Craighead ran into the bedroom and shot Mrs. Dotson. While Craighead was in the bedroom, defendant attempted to leave, but he was stopped by the padlock. Defendant went into the kitchen and drank some water and smoked a cigarette in an attempt to calm his nerves. He heard Craighead turning over things in the back of the house. Craighead appeared, carrying jewelry and other items. Craighead still had the gun and told defendant that it was time for them to leave.

They exited by the front door, and defendant tried to get away quickly because he feared the neighbors would see him leaving the house after the shooting. Defendant made some calls to try to find a place to spend the night. He recalled the chase with the police officer and explained that he had been drinking and was not thinking clearly. He was afraid the police would conclude that he had been involved in the shootings, so he ran away. He thought the police would catch only him and pin the murders on him. He testified that he never intended to kill the victims and denied stealing anything. He said that he had been to the victims' home a week or so before the murders and had helped them move some things; however, he did not remember ever touching the metal boxes that had been introduced into evidence. The morning after the shooting, defendant asked his mother to take him out of town. He went to a cousin's house in Rockford, but after a couple of weeks he went to another cousin's house in Beloit. Defendant agreed that his videotaped statement was accurate. The defense rested.

Defense counsel objected to the admission of the trash that Mr. Vickers discovered in his yard. Initially, the trial court sustained the objection but then allowed it for a limited purpose. The State argued that it was necessary to show that Vickers was an innocent man who had found some evidence and reacted by giving it to the police, whereas defendant reacted by running away to Wisconsin. The trial court allowed the evidence, and the State discussed the trash during rebuttal.

The jury retired to consider its verdict at 12:05 p.m. At 4 p.m., the jury sent a note asking if it could have the written statement of Ms. Hinkle. The trial court and the lawyers agreed that the statement should not be given to the jury because it was never introduced into evidence. The trial court then stated on the record that an hour earlier

the jury had asked the bailiff for a transcript of the entire trial. Without consulting anyone, the bailiff told the jury that the transcript was not available. The trial court concluded that the bailiff's answer was correct, and both the prosecutor and defense counsel agreed. At 7:45 p.m., the jurors announced that they were deadlocked. The trial court instructed the jury to attempt to break the deadlock. At 9:50 p.m., the jury came back with guilty verdicts on both counts. Defendant was later sentenced to life in prison. Defendant now appeals.

## ISSUES

We have separated defendant's allegations of error into three specific categories: (1) evidentiary issues, (2) complaints of the ineffective assistance of counsel, and (3) cumulative error. While some of defendant's complaints overlap, we will address each issue separately.

## I. Evidentiary Issues

■ We consider first whether defendant was denied a fair trial due to the actions of the State, as we believe this complaint has the most merit. Defendant contends that he was denied a fair trial due to improper actions by the prosecutor, including presenting to the jury two guns that were completely unrelated to the instant case, presenting evidence of papers bearing Mr. Dotson's name that were unaccountably found in John Vickers' trash, and arguing that defendant's guilt was established by comparing defendant's actions to those of John Vickers. The State responds that these issues are waived because in his posttrial motion defendant failed to allege as error any of the three instances mentioned above and at the trial failed to object to the presentation of Mr. Vickers' trash and to comments during closing argument comparing Vickers' actions to defendant's actions. The State also asserts that the alleged errors do not amount to plain error because this case was not closely balanced and because the alleged errors were not of such magnitude that defendant was denied a fair trial. According to the State, error, if any, was harmless because there is no possibility that the verdict would have been different had the evidence not been presented or the prosecutor not commented upon Mr. Vickers' actions and compared them to defendant's actions. After careful review, we find that the alleged errors were harmless.

The State is correct that defendant failed to complain in his posttrial motion of the alleged errors complained of herein. However, defendant did object to the presentation of the guns at the trial. In any event, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a). In order to invoke the plain error doctrine, it must be plainly apparent that an error so prejudicial has oc-

curred so that real justice has been denied or that the verdict of the jury may have resulted from the error. See *People v. Carlson*, 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239 (1980). Defendant raises serious questions on appeal, and we are compelled to address defendant's arguments under the plain error doctrine.

■ The most troubling aspect of this case is that two guns that were totally unrelated to the victims' murders were offered to the jury. A weapon may be admitted into evidence only where there is proof to connect it both to the crime and to the defendant. See *People v. Wade*, 51 Ill. App. 3d 721, 729, 366 N.E.2d 528, 534 (1977). In order to establish a connection there must be: (1) sufficient testimony to establish that a weapon was used, (2) substantial evidence the defendant participated in the crime, and (3) testimony that the weapon admitted was similar to the one used during the crime. See *People v. McCasle*, 35 Ill. 2d 552, 559, 221 N.E.2d 227, 231 (1966).

■ In the instant case, the State failed to establish that the two guns were connected to the crime. To the contrary, the State's expert, Thomas Gamboe, testified that People's exhibits 12 and 13, the spent projectiles recovered at the scene, could not have been fired from either People's exhibit 7 or 8, the two guns presented to the jury by the prosecutor. People's exhibit 7 was a .32-caliber weapon that the police recovered from Judy Dotson's son. People's exhibit 8 was a .38-caliber automatic weapon recovered from Michael Gillespie. The State was fully aware that neither weapon was in any way relevant to these particular murders; nevertheless, the State presented extensive evidence about both weapons. For example, police officers testified about recovering the guns and sending them to forensics for testing. James Duggan, Jr., a fingerprint expert, testified that he tested the guns for fingerprints but that neither weapon had readable prints. As defendant points out, the State presented "pages and pages of testimony" concerning the two guns.

In particular, we point to testimony regarding Michael Gillespie and the gun recovered from his house. The record here fails to disclose how or why Michael Gillespie became part of the State's investigation. All the jury heard was that Officer Todd Link from the Collinsville police department was "assigned a lead" as part of his duties with the major case squad and that, through this lead, he recovered a .38-caliber handgun from Gillespie. Gillespie's role in this matter was never identified.

By presenting two irrelevant guns and securing testimony about the guns, the prosecutor engaged in deliberate prosecutorial overkill and jeopardized a strong prosecution case. The State not only failed to connect the guns to the instant case, but it ultimately excluded them

from the crime. Since there was no connection in the instant case making the guns relevant as evidence to the alleged crime or defendant, the prosecutor erred in offering the guns as evidence.

■ Defendant argues that he was further prejudiced by the State's presentation of papers bearing Marty Dotson's name that were unaccountably found in a third party's trash can. While trash is not as intrinsically prejudicial as guns, the problem remains that there was no connection made between the trash and the murders. The defense attorney explained that he did not object to the introduction of the trash evidence during the State's case in chief because he had no idea why the State was offering the evidence but that he "assumed somehow they [the State] would link it up with the defendant." However, since the trash was never connected, he felt compelled to object. The prosecutor replied, "If the defense is going to get up and say my client is an innocent bystander, well, I think the jury is entitled to hear what an innocent bystander really does when they have found information of note." The trial court agreed with the State and said, "For that very limited purpose, I will allow you to address it."

The test for the admissibility of evidence is whether it fairly tends to prove the particular offense charged; whether that which is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable. See *People v. Ward*, 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702 (1984). The admission of evidence is within the trial court's discretion, and its ruling will not be reversed unless there is a clear showing of an abuse of that discretion. *Ward*, 101 Ill. 2d at 455-56, 463 N.E.2d at 702. The trash was certainly not relevant to defendant's guilt. The jury was left to speculate as to how the trash might have been placed in Vickers' trash can and as to defendant's role, if any.

The prosecutor discussed the trash during closing argument, even though there was no evidence that the trash was ever at the victims' home or that the trash was deposited in Vickers' trash can by either Craighead or defendant. While courts allow a prosecutor great latitude in making closing arguments (see *People v. Cisewski*, 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976 (1987)), he or she can only argue the facts introduced into evidence and reasonable deductions and inferences to be drawn from those facts. See *People v. Vasquez*, 8 Ill. App. 3d 679, 681, 291 N.E.2d 5 (1972). The comments about which defendant complains concerned irrelevant evidence, which should not have even been allowed by the trial court.

Notwithstanding our criticism of the prosecutor's actions, the question becomes whether the error caused by the guns and trash evidence constitutes reversible or harmless error. See *People v. Jackson*,

195 Ill. App. 3d 104, 113-14, 551 N.E.2d 1025, 1030 (1990). Error is deemed harmless where the evidence supporting a defendant's conviction is so overwhelming that the defendant would have been convicted even if the error was eliminated. *Jackson*, 195 Ill. App. 3d at 114, 551 N.E.2d at 1030.

In *People v. Howard*, 209 Ill. App. 3d 159, 568 N.E.2d 56 (1991), our colleagues in the First District determined that it was harmless error to admit a gun that was in the defendant's possession when he was arrested for unlawful use of a weapon four days after the actual murders for which he was on trial. The *Howard* court held that even though the gun was improperly admitted, the defendant was not prejudiced in light of the overwhelming evidence adduced at the trial that established the defendant's guilt. *Howard*, 209 Ill. App. 3d at 180, 568 N.E.2d at 69.

In the instant case, the prejudicial effect of the error was significantly reduced because the State withdrew its motion and the guns were not admitted into evidence. Moreover, contrary to defendant's assertions, the evidence in this case was not close. Upon careful review, we find that the evidence is actually overwhelming.

Defendant admitted that he was present at the scene. Defendant, not Craighead, was well acquainted with the victims. Shondreka Hinkle testified that on the evening of the murders Brandon Craighead told her that he needed some money and was going to kill a woman in order to get some money. According to Hinkle, defendant responded to Craighead's remark by telling him to be quiet because Hinkle might tell someone of their plans. Craighead admitted that he was at Hinkle's house on the night of the murders. Defendant's fingerprint was found on a metal box in the victims' bedroom, and defendant offered no plausible explanation as to how it might have gotten there.

Ameritech phone records showed that calls were made on the victims' cellular phone after the victims were killed. Angeletta Jacobs, Craighead's cousin and a friend of defendant's, testified that she received a phone call from defendant around midnight. According to Jacobs, the tone of the conversation was normal and nothing defendant said led her to believe that anything was amiss. Hinkle's and Jacob's testimony established that defendant was a willing participant in the crimes.

Furthermore, defendant fled after the murders. Flight, when considered in connection with all other evidence in a case, is a circumstance that may be considered by a jury as tending to prove guilt. *People v. Lewis*, 165 Ill. 2d 305, 349, 651 N.E.2d 72, 93 (1995). First, defendant left the scene with Craighead. Defendant testified

that Craighead coerced him into the car; however, when a police officer tried to stop the vehicle in which he and Craighead were riding, defendant gave Craighead directions in order to elude the officer. When Craighead stopped the vehicle, defendant did not surrender himself to police but instead ran away with Craighead. Second, defendant went on the lam. He hid out at his cousin's house in Rockford, and he later went to another cousin's home in Wisconsin. He made no attempt to contact the police during this time.

When defendant was found by police in Beloit, Wisconsin, several weeks after the murders, photocopies of newspaper articles describing the murders were found hidden beneath his bedroom carpet. The evidence against defendant was overwhelming. Defendant was aware of Craighead's plans to rob and murder the victims and used his friendship with the victims to gain entry into their home. Contrary to defendant's assertions, the record shows that defendant was a willing participant in the scheme. Therefore, we do not believe that the errors of the prosecution reasonably affected the verdict.

## II. Ineffective Assistance of Counsel

■ We next consider whether defendant was denied the effective assistance of counsel. Defendant contends that his trial counsel was ineffective for (1) failing to object to the State's presentation of the guns to the jury and (2) failing to present favorable evidence of defendant's character. We disagree.

A two-part standard for claims of the ineffective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and was subsequently adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). To establish such a claim, a defendant must show that counsel committed such serious errors that, by an objective standard, his performance was incompetent and that the incompetence so prejudiced defendant that he was denied a fair trial. *People v. Berry*, 175 Ill. App. 3d 420, 427, 529 N.E.2d 1001, 1006 (1988). It is not enough to demonstrate that counsel's errors had some conceivable effect on the outcome of the case; rather, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. *Berry*, 175 Ill. App. 3d at 427, 529 N.E.2d at 1006.

> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

In the instant case, defendant did not suffer any prejudice.

Regarding defendant's first assignment of counsel error, defense counsel did, in fact, object to the introduction of the guns into evidence after it became obvious that the guns were in no way relevant to the case. Ultimately, the State withdrew its motion, and the guns were not allowed in evidence. Therefore, the record indicates that defense counsel acted effectively.

Defendant's second assignment of counsel error is that defendant's counsel's decision not to introduce character evidence favorable to defendant constituted ineffective assistance. Defense counsel explained that he was not going to submit favorable character evidence on behalf of defendant because he believed that if he did, the State could then introduce evidence against defendant of a pending investigation of an armed robbery in Springfield. The general rule is that evidence that defendant committed another crime is inadmissible for the purpose of showing that the defendant is predisposed or has a propensity to commit the crime in question. *People v. Lucas*, 151 Ill. 2d 461, 485, 603 N.E.2d 460, 470 (1992). However, evidence of other crimes may be admitted if it is relevant for any other purpose than to show the propensity to commit crime (*People v. McKibbins*, 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824 (1983)), such as to show motive, intent, or identity. See *Lucas*, 151 Ill. 2d at 486, 603 N.E.2d at 470.

Here, it is unnecessary for us to determine whether defense counsel was right or wrong about his decision not to present character evidence on defendant's behalf. Even assuming, *arguendo*, that defense counsel was wrong, defendant has failed to show that, but for defense counsel's error, the verdict would have been different. As previously set forth, the evidence against defendant was overwhelming.

### III. Cumulative Error

■ We are cognizant of the fact that prejudice is not to be our sole concern when reviewing whether or not a defendant is entitled to a new trial, but we are also required to consider whether the trial was fair, orderly, and impartial. See *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000). Relying on *Blue*, defendant insists that he was denied a fair trial. However, the errors in the instant case did not attain the level reached in *Blue*, nor did the errors prejudice defendant's right to a fair trial.

In *Blue*, our supreme court held that each of the errors committed at the defendant's trial "cast[ ] doubt upon the reliability of the judicial process" and "created a pervasive pattern of unfair prejudice to defendant's case." 189 Ill. 2d at 139, 724 N.E.2d at 941. Errors in *Blue* included the improper introduction and display of the dead police

officer's bloodied uniform on a headless torso (189 Ill. 2d at 120-26, 724 N.E.2d at 931-34), inflammatory testimony by the victim's father concerning the distress and sorrow felt by the family over the loss of the victim (189 Ill. 2d at 130-32, 724 N.E.2d at 936-37), inflammatory testimony from a police commander (189 Ill. 2d at 132-34, 724 N.E.2d at 938), inflammatory testimony by the prosecutors (189 Ill. 2d at 134-37, 724 N.E.2d at 938-40), and improper argument by the prosecutors that the victim's family needed to "hear" from the jury and that the jury should send a "message" of its support to the police (189 Ill. 2d at 126-27, 724 N.E.2d at 934).

It is well accepted that a defendant is not entitled to an error-free trial, and few, if any, trials are free from error. *People v. Peter*, 55 Ill. 2d 443, 447, 303 N.E.2d 398, 401 (1973). Unlike *Blue*, we conclude that in this case, unlike the situation in *Blue*, the overall integrity of the judicial process was not compromised due to the errors committed. A review of the record here reveals that despite the improper conduct of the prosecutor, the evidence presented at the trial overwhelmingly implicated defendant in the murders of Marty and Judy Dotson. The State ultimately withdrew its motion to admit the irrelevant guns, thereby reducing the effect of the prosecutor's error. Moreover, we find that other improper evidence, such as the trash, had only a *de minimis* effect on the outcome of this trial.

## CONCLUSION

Overall, we find that defendant was not prejudiced by his attorney's actions. We also find that defendant was not denied a fair trial due to the cumulative effect of error. We, however, caution the State to use restraint and not expose the jury to highly prejudicial, irrelevant evidence in the future. Because our review of the record overwhelmingly shows that defendant was an active participant in these ghastly crimes against two innocent victims, we do not find that the prosecutor's wrongdoing warrants a new trial. We are confident that defendant received a fair trial. However, if we were presented with a less clear-cut case, the outcome would, in all likelihood, be different.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby affirmed.

Affirmed.

MAAG and KUEHN, JJ., concur.